THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARVIN REEVES, Defendant-Appellant.

First District (6th Division)   No. 1—91—2025

Opinion filed March 17, 1995.

214

James E. Chadd, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RAKOWSKI delivered the opinion of the court:

Marvin Reeves (defendant) and codefendant Ronald Kitchen were charged with first degree murder and aggravated arson. Defendant's case was severed from that of Kitchen, and following a jury trial, he was convicted of these offenses. Defendant was then sentenced to five concurrent terms of natural life imprisonment without parole. The issues on appeal are: (1) whether defendant was proved guilty of first degree murder beyond a reasonable doubt; and (2) whether the State violated defendant's sixth amendment right to confront and cross-examine witnesses against him by introducing out-of-court statements of the nontestifying codefendant implicating defendant in the

murders. Although defendant raises other issues, *i.e.*, improper arguments, improper victim impact testimony, three *Batson* issues, and ineffective assistance of counsel, we find the first two issues to be dispositive.

Victor Guajardo, Sr., testified that he lived at 6024 South Campbell next door to the Sepulvedas. On July 27, 1988, at around 3 a.m., Guajardo Sr.'s wife woke him up and said that the Sepulvedas' house was on fire. Guajardo ran to the front of the house and began knocking. He tried to open the front door, which was locked, and he went to the back of the house and began knocking, but he received no response and was unable to unlock the door. At that point the fire department arrived.

On July 27, 1988, James Winbush of the Chicago fire department responded to a call of a fire at 6028 South Campbell. Once inside, Winbush and the other fireman extinguished the fire. Winbush noted that the fire originated in several unconnected spots which indicated the possibility of a homicide. The bodies of two women and three children were found. The victims were identified as Debbie Sepulveda, her three-year-old son and two-year-old daughter, and Rose Rodriguez and her three-year-old son. Dr. Robert J. Stein, chief medical examiner for Cook County, conducted autopsies of the five victims. He determined that the cause of Rose Rodriquez' death was manual strangulation due to hemorrhage areas in the internal neck muscles as well as a number of external abrasions and contusions to her neck. Further examination revealed a laceration on her scalp due to trauma from a blunt instrument as well as black and blue eyes from being hit with a fist. The cause of death of the other four victims was asphyxia due to suffocation. There was no soot found in the trachea or carbon monoxide in the blood of any of the victims, which indicated that they died prior to the fire.

Detective Craig Cegielski of the Chicago police department arrived at the scene of the crime around 5 a.m. When he went to the basement, he found manila envelopes 1 inch by $1^1/2$ inches on the workbench and in a box. The detective testified that the envelopes of this type were commonly used to package cocaine and marijuana. The envelopes were not inventoried, but Cegielski subsequently learned that Sepulveda and Rodriquez had been involved in drug trafficking.

Detective Dan McInerney of the bomb and arson unit arrived at the crime scene around 4 a.m. As a result of his investigation of the area, he determined that the fires had been independently set by available materials and hand-ignited with an open flame. The detective concluded that the fires were smoldering and burning slowly for

approximately three hours before they were extinguished. Under these circumstances, lighter fluid (later found in the trunk of defendant's car) would either burn off or be washed away during the extinguishing of the fire.

On August 26, 1988, Detective Thomas Ptak searched defendant's car, a 1977 Buick Regal, and found a plastic container with a small amount of charcoal lighter fluid and an empty gasoline can.

Victor Guajardo, Jr., testified that on the evening of July 26, 1988, he saw an older model, yellow two-door vehicle parked outside his parents' home. On August 30, 1988, two police officers showed Guajardo, Jr., photographs of defendant's vehicle, which he identified as the one he had observed on the evening of July 26, 1988. At the trial, Guajardo, Jr., viewed the same photographs and again identified the vehicle as the one he had seen in front of his house the night before the fire.

Defendant and Kitchen were in custody on the basis of information provided by Willie Williams. Williams testified that he knew Kitchen through Williams' friend Gerard and through Kitchen's cousin, Eric Wilson, who was married to Williams' sister. According to Williams' testimony, defendant, Gerard and Williams used to steal cars together. Defendant lived near Williams' home and was dating Williams' cousin. From 1986 through 1988 Williams, Kitchen and defendant sold cocaine for Jimmy Peoples, the supplier in charge of the distribution of cocaine for the south side of Chicago. Williams would drive defendant and Kitchen to their deliveries and was paid $600 to $800 per week for his services. Williams would use his own or Kitchen's car.

Williams further testified that sometime in November 1986 he went with defendant and Kitchen to make a cocaine delivery. At defendant's direction, the three drove to a restaurant on 72nd and Western, where they met a woman later identified as Rose Rodriquez and gave her cocaine. In January 1987, Williams drove defendant and Kitchen to a tavern at 18th Street and May, where they met a woman identified as Sepulveda and gave her cocaine. Throughout 1987 defendant and Kitchen had Williams drive them to deliver cocaine to both women five or six more times. Williams also drove defendants to deliver cocaine to other customers, including a person named Diana Rivera. In November or December 1987 and early 1988, Williams and the defendant returned to Sepulveda's house six or seven times to deliver cocaine.

On one occasion in May 1988, Williams drove defendant and Kitchen to Sepulveda's house to deliver cocaine, and they told her that she had to pick up her payments. Outside, defendant repeated

the statement that "[s]he better pick up her payment or she know what is going to happen."

Williams testified that he pleaded guilty to a pending burglary case in June 1988 and was sentenced to three years' imprisonment. During that time he kept in contact with defendant and Kitchen. On August 1, 1988, Williams called Kitchen and spoke with him. On August 5, 1988, Williams called Detective John Smith of the Chicago police department and told him that a couple of his friends had killed two girls (the victims). On August 6, 1988, Williams called defendant and asked "what was going on." Defendant did not reply, and Williams told defendant that Kitchen reported what he and defendant had done. Defendant replied "I don't see why Ronnie (Kitchen) be telling you that over the phone because if I get caught, I'd get him too, *** (I'd) kill Ronnie too." Defendant then commented that talking on the telephone was how "Jeff Forte got caught" and that he would tell Williams about "Debbie" and "Mary" (the victims) when he saw him in person. In the same conversation, defendant also stated that "Diana Rivera was falling behind in her payment, and if she didn't pick hers up, the same thing that happened to Debbie and Mary would happen to her." Defendant ended the conversation by saying "[a]in't no stopping us now."

According to Williams' testimony, after the August 6 conversation with defendant, he called the police and told them that he believed he could get defendant to talk on the telephone about the murders. As a result, the police obtained a court order to permit them to overhear any telephone calls between Williams and defendant. However, defendant did not talk about the murders on the telephone.

When Williams spoke with Kitchen, he had not yet read about the murders. However, he contacted Detective Smith after he read about the murders in the paper. Williams was placed in protective custody but was not promised anything in exchange for his testimony. He also admitted two other convictions for theft in addition to the one for burglary.

Detective Smith testified on cross-examination that Williams gave him specific information regarding the murders which matched the evidence from the crime scene and autopsies. The other detectives corroborated Smith's testimony regarding Williams' conversation.

On rebuttal, Detective Michael Kill testified that he set up surveillance on defendant and Kitchen at 5308 South Emerald which was the home of Jimmy Peoples and Eric Wilson. According to Kill's testimony, between August 12 and 25, he saw Kitchen, Peoples and

defendant at that location about six times. Officer Richard Dowling testified that sometime in May 1988 he observed Eric Wilson driving Jimmy Peoples' Cadillac with defendant, Kitchen and Williams as passengers.

Defendant contends that the State violated his sixth amendment right to confront and cross-examine witnesses against him by introducing the out-of-court statements of his nontestifying codefendant implicating defendant in the present offense.

The United States Supreme Court in *Bruton v. United States* (1968), 391 U.S. 123, 127, 20 L. Ed. 2d 476, 480, 88 S. Ct. 1620, 1623, held that the State's use of the inculpatory extrajudicial statements of a nontestifying codefendant violates a defendant's constitutional right to confront and cross-examine witnesses against him even though the jury had received an instruction that it must disregard the codefendant's confession in determining the defendant's guilt or innocence. In *Bruton,* petitioner and his codefendant (Evans) were convicted of armed postal robbery in a joint trial. Evans did not take the stand but a postal inspector testified that Evans confessed orally that he and petitioner committed the robbery. The trial court instructed the jury that although Evans' confession was competent evidence against him, it was inadmissible hearsay against petitioner and had to be disregarded in determining petitioner's guilt or innocence. Both parties appealed to the court of appeals, which reversed Evans' conviction on the ground that Evans' oral confession should not have been received against him but affirmed petitioner's conviction in view of the trial judge's instructions. (*Evans v. United States* (8th Cir. 1967), 375 F.2d 355, 361.) The Supreme Court held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Bruton,* 391 U.S. at 126, 20 L. Ed. 2d at 479, 88 S. Ct. at 1622.

In *People v. Cruz* (1988), 121 Ill. 2d 321, 521 N.E.2d 18, defendant Rolando Cruz and codefendants Alejandro Hernandez and Steven Buckley were charged with the murder as well as other offenses against Jeanine Nicarico. Defendant's pretrial motion for severance, for separate juries and for a change of venue were denied. Following a joint trial, defendant and Hernandez were found guilty as charged. Defendant was sentenced to death and appealed to the supreme court. His principal contention of error on appeal was that the circuit court failed to sever the codefendants' trials and that defendant was denied his right to confront witnesses against him as guaranteed by the

sixth amendment of the United States Constitution. Defendant claimed that "statements made by Hernandez to various witnesses that he (Hernandez) had been involved in the crime with 'friends' or 'named individuals' directly implicated Cruz [defendant] because the statements were inadequately redacted. (Redaction involves deleting, from out-of-court statements, references to defendants other than the declarant.)" (*Cruz*, 121 Ill. 2d at 324.) The court, relying on *Bruton* (391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620), held that "the nature of these redactions in the context of the joint trial and the testimony linking Cruz [defendant] with Hernandez rendered it impossible for the jury to conclude that the persons to whom Hernandez referred were anyone other than the two men seated next to him in the courtroom." (*Cruz*, 121 Ill. 2d at 331.) The court also noted that any possibility that the jury would be able to follow the court's limiting instructions was negated by the prosecutor's encouragement to the jurors to consider each codefendant's admission against the other defendants. (*Cruz*, 121 Ill. 2d at 332.) The court concluded:

"[T]he evidence was neither so strong as to make the State's *Bruton* violations harmless error, nor so weak as to necessarily leave a reasonable doubt of defendant's guilt. [Citations.]

Because statements by a codefendant presented by the prosecution improperly referred to defendant, and the prosecution subsequently urged the jury to consider these statements against defendant, a violation of defendant's constitutional rights occurred ***." *Cruz*, 121 Ill. 2d at 336-37.

In *People v. Williams* (1987), 159 Ill. App. 3d 612, 513 N.E.2d 415, the court held that it was improper for the police officer to testify regarding the substance of his conversation with a nontestifying third party where the statements were prejudicial to defendant and the resulting prejudice was not cured by jury instructions. The error was compounded by the prosecutor's reference in closing rebuttal argument to the testimony as substantive evidence of defendant's guilt. (*Williams*, 159 Ill. App. 3d at 620.) In *People v. Eddington* (1984), 129 Ill. App. 3d 745, 473 N.E.2d 103, the court held that the testimony of a co-conspirator as to the defendant's narrative description of the murder made more than three months after the offense was not admissible under the co-conspirator exception to the hearsay rule. The court further held that the error was compounded by the prosecutor's opening statement and closing argument thus depriving defendant of a fair and impartial trial. *Eddington*, 129 Ill. App. 3d at 770.

The out-of-court statements in the instant case were introduced as part of Williams' testimony regarding a telephone conversation

with Kitchen and Detective Smith. Williams testified that he called Kitchen on August 1, 1988, and spoke with him for a few minutes. On August 5, 1988, he called Detective Smith and told Smith that he knew something about the murders. Williams testified that "I told him that—a couple of friends of mine had killed the two girls I know."

■ The State's first argument is that defendant has waived this issue for purposes of review because defendant failed to present a claim of error in his post-trial motion that was narrow and specific. The State claims that defendant's statement that the trial court erred in denying his objections to evidence offered by the State regarding an inference that Kitchen had confessed along with the contents of the confession was too general a contention of error. However, assuming, *arguendo*, that the State is correct, we conclude that the plain error rule is applicable pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) as the evidence is closely balanced and the error affected defendant's substantial rights. *People v. Campbell* (1983), 115 Ill. App. 3d 631, 636, 450 N.E.2d 1318.

■ The State also argues that the conversation between Williams and Kitchen was properly admitted because Williams did not testify to the substance of any statements Kitchen may have made inculpating defendant. However, contrary to the State's argument, the substance of Williams' conversation was revealed to the jury when in opening statement the prosecutor told the jury:

"And Williams tell [*sic*] you that when he called the defendant up, he said hey, I talked to Ronnie a couple of days ago, he told me you and him killed Debbie and Mary and the kids because they were behind in their payments."

The prosecutor made this statement immediately after the court overruled defense counsel's objection to discussing Williams' conversation with Kitchen. The substance of Williams' conversation was also brought to the attention of the jury when Williams testified that following a conversation with Kitchen, he contacted Detective Smith and reported that he knew something about the murders. Williams then told Smith that two of his friends had killed the two girls that Williams knew. The next day he told defendant that "Ronnie had told me what him and Marvin had done." The court also overruled defense counsel's objections to this testimony by Williams regarding his conversation with Kitchen.

During closing argument the prosecutor again made reference to Williams' conversation with Kitchen when he stated:

"You remember when Willie testified. He told you he call [*sic*] up Marvin, Marvin Reeves. He said, what's going on Marvin. Marvin says, nothing. Willie says, I talked to Ronald Kitchen the other day. And he told me what the two of you had done."

The prosecutor further argued:

> "And particularly you heard testimony that on July 31st he called up Ronald Kitchen, had a conversation. He called up Ronald Kitchen again and had another conversation.

> \* \* \*

> After that is when he called up Detective Smith from Area 3 Violent Crimes, and he told Detective Smith, I want to report a murder. He said two of my friends killed two women and some children I know."

During rebuttal, the prosecutor repeated Williams' statement to defendant that "Ronnie told me what you and him did to Debbie and Mary and the kids." These errors, which made it obvious to the jury that Kitchen had made statements inculpating defendant, were compounded by the fact that the jury never received any limiting instruction as to the proper and improper use of Kitchen's conversation with Williams.

■ The State's final argument is that the conversation at issue was not hearsay because it was admitted only to show what led Williams to call defendant and in order to explain his course of conduct. However, the fact that the State used this incriminating evidence in opening and closing statements as evidence of defendant's guilt renders the State's argument meritless. We further note that what led Williams to place a telephone call to defendant may not even be relevant to this case. However, assuming, *arguendo*, that it is, the cases cited by the State are distinguishable.

In *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183, the victim's boyfriend testified that he told the investigating detectives that the only person the victim could have been talking about when she told the detectives that her assailant was named "Keith" was the defendant, Keith Shum. The boyfriend then gave the detectives the defendant's address. The supreme court held that the boyfriend's testimony was not hearsay, but was only offered to establish what had occurred during the boyfriend's interview with the detectives. (*Shum*, 117 Ill. 2d at 343-44.) In *Shum*, unlike the instant case, the declarant and her boyfriend were both present in court and subject to cross-examination. See *People v. Rogers* (1980), 81 Ill. 2d 571, 579-80, 411 N.E.2d 223.

In *People v. Coleman* (1990), 201 Ill. App. 3d 803, 559 N.E.2d 243, the victim of a purse snatching testified that she received a phone call from the janitor at a school near the place where her purse was stolen. As a result of the call, the victim went to school and recovered her purse. This court held that the victim's testimony did not contain hearsay evidence but simply established what her conduct was

concerning the purse. (*Coleman*, 201 Ill. App. 3d at 805-06.) We also note that the victim's statement in *Coleman*, unlike this case, refers to the location of the victim's purse rather than defendant's guilt or innocence.

In *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146, Officer Coakley testified that he spoke to Infelise (the victim) at the hospital for three or four minutes on the morning of December 12, 1982, and that he and his partner went to look for Robert Gacho. The supreme court held that because the officer did not testify to the substance of the conversation with the victim, but only to the fact that he had a conversation with him and as to the subsequent investigatory procedure, the officer's testimony was properly admitted. (*Gacho*, 122 Ill. 2d at 247-48.) In the instant case, the prosecutor referred to the substance of Williams' conversation with defendant and Kitchen during his opening statement and closing argument as well as his direct examination of Williams.

Taking into consideration the entire record, in the instant case, we have no doubt that the combined effect of Williams' testimony and the prosecutor's arguments conveyed to the jury the substance of Kitchen's out-of-court statements which clearly implicated defendant in the murders.

The next issue is whether the remaining evidence of defendant's guilt was sufficient to convict. Defendant contends that it was not because the State's evidence of his guilt rested upon ambiguous statements which, assuming defendant made the statements, did not prove that he was responsible for this offense. When an appeals court reviews the sufficiency of evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) Then, " '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' " (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, quoting *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.) Further, discrepancies in the testimony of witnesses go to the issue of credibility, which must be judged by the trier of fact. *People v. Thomas* (1981), 96 Ill. App. 3d 443, 450, 421 N.E.2d 357.

In the instant case, Williams testified that he and defendant and Kitchen were engaged in drug trafficking with several other people, including the two women who were murdered. Williams testified that he would drive defendant and Kitchen to deliver drugs to Rodriquez, Sepulveda and Diana Rivera. In May 1988, Williams drove Kitchen and defendant to Sepulveda's house to deliver cocaine, and they told her that she had to pick up her payments. When they left, defendant again said "[s]he better pick up her payment or she know what is going to happen."

Additional evidence of defendant's guilt was Williams' testimony regarding his telephone conversation with defendant on August 6, 1988. Williams testified that he telephoned defendant and asked him "what was going on." Williams then stated "I told him Ronnie (Kitchen) had told me about what him and Marvin (defendant) had done. And he said I don't see why Ronnie be telling you that over the phone because if I get caught, I'd get him too—." In response to the court reporter's question "I'm sorry, If I get caught—" Williams responded "He'd kill Ronnie, too." Williams then testified as to the remainder of his conversation with defendant. According to Williams, defendant then commented that talking on the telephone was how "Jeff Forte got caught," and that he would tell Williams about "Debbie" and "Mary" (the victims) when he saw him in person. Defendant also mentioned that "Diana Rivera was falling behind in her payment, and if she didn't pick hers up, the same thing that happened to Debbie and Mary would happen to her." Defendant ended the conversation by saying "[a]in't no stopping us now." The other evidence consisted of Victor Guajardo, Jr.'s testimony that he saw a vehicle outside Sepulveda's home the night before the murders which he later identified as defendant's vehicle and the testimony of Ptak that a container of charcoal lighter fluid and an empty gasoline can were found in the trunk of defendant's car.

Defendant argues that, because Williams was an admitted car thief, burglar and drug dealer, he was not a credible witness but that even if Williams' testimony was believable, it did not provide proof beyond a reasonable doubt of defendant's guilt. Defendant claims that his alleged statements made only ambiguous reference to having some knowledge about the murders or playing a possible role such as making threats which fell short of admitting responsibility for the murders. Defendant also argues that his alleged statements when confronted with Kitchen's conversation with Williams only indicated that Kitchen's telephone conversation could get defendant in trouble. Defendant's statements were not an acknowledgement that what Kitchen said was true. Defendant further argues that his alleged statement, which constituted a threat against Diana Rivera, only

indicated that he knew about the victims' fate. It was not a statement that he committed the offense.

Thus, defendant claims that his comments to Williams have an innocent explanation and form an ambiguous connection with the present offense. The remaining evidence presented by the State only shows that he had a possible motive to harm the victims and that his car was near Sepulveda's home nine hours before the fire was discovered. According to defendant, viewing the State's evidence in its best light, no rational trier of fact could find defendant guilty beyond a reasonable doubt. We disagree.

■ The evidence supports the fact that defendant had a prior relationship with the two victims through his drug dealing activities and reportedly made threatening statements as to the consequences of one of the victims and Rivera being behind in their payments. In addition, defendant's car was seen in front of the victim's house the night before the murders occurred. Considering these facts along with Williams' testimony regarding his conversation with defendant, we conclude that the evidence is sufficient to convict. As the court in *Cruz* stated, "the evidence was neither so strong as to make the State's *Bruton* violations harmless error, nor so weak as to necessarily leave a reasonable doubt of defendant's guilt." *Cruz*, 121 Ill. 2d at 336.

■ Accordingly, defendant's conviction should be reversed and the case remanded for a new trial free of prejudicial error.

Reversed and remanded.

McNAMARA, P.J., and EGAN, J., concur.