SECOND DIVISION

December 18, 2001

No.  1-99-2204

)

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of 

Plaintiff-Appellee, ) Cook County.

)

) 

)

WILLIE SAMPLE, ) Honorable 

) Edward Fiala,

Defendant-Appellee. ) Judge Presiding.

)

JUSTICE GORDON delivered the opinion of the court:

Defendant Willie Sample appeals from his convictions for four counts of first degree murder (720 ILCS 5/9-1(a)(1) and (3) (West 1996)), one count of armed robbery (720 ILCS 5/18-2 (West 1996)), and one count of home invasion (720 ILCS 5/12-11 (West 1996)).  Defendant received sentences of thirty-five years for first degree murder and six years each for armed robbery and home invasion, all to be served consecutively.  

In this appeal, defendant argues that his convictions must be reversed because he was denied his sixth amendment right to confront and cross-examine witnesses when 
the State elicited hearsay evidence from police officers that non-testifying co-defendants implicated him in the crimes.  Defendant also argues that the circuit court improperly imposed consecutive sentences because defendant did not inflict bodily injury during the commission of the home invasion or armed robbery as required under 730 ILCS 5-8-4(a).  Defendant further contends that the consecutive sentences for the home invasion and armed robbery must be vacated because they are lesser-included offenses of felony murder.  Finally, defendant challenges the consecutive sentences as unconstitutional under the United States Supreme Court's ruling in 
Apprendi v. New Jersey
, 530 U.S. 466, 120 S.Ct. 2348 (2000).  Defendant claims, and the State concedes, that he is entitled to 999 days credit for time served rather than the 899 days stated in the mittimus.  For the reasons stated below, we affirm defendant's convictions and consecutive sentences and amend the mittimus to reflect 999 days served.

BACKGROUND

Willie Sample was convicted by a jury of four counts of first degree murder (including intentional murder and felony-murder), one count of home invasion, and one count of armed robbery.  The charges grew out of the robbery and murder of Jeremy Price in his home on September 22, 1996.  The verdict returned on the murder count was a general verdict.  The judge imposed a 35 year sentence based on the intentional murder count and six years each on the home invasion and armed robbery counts.  Defendant's sentences are to run consecutively.

At defendant's trial, Darnell Lewis testified for the State that on September 22, he was in his family's apartment with his step-uncle Jeremy Price. At about 9:45 p.m., Lewis was in his bedroom when he heard Price calling out his name.  When Lewis came to his bedroom door he observed Price attempting to push closed the front door of the apartment in an effort to keep someone out.  Lewis testified that the front door was about six or seven feet from his bedroom door.  A man in a ski mask eventually pushed his way in through the front door and Lewis witnessed his uncle and the man struggling.  Shortly thereafter, the men stopped struggling and Lewis saw that the ski mask had come off his uncle's assailant.  Lewis recognized the assailant as a neighborhood resident, Antoine Ashford.  According to Lewis, another man then entered the apartment and pulled a gun on his uncle. Lewis testified that this second man looked at Lewis as he entered the apartment. 

At about this moment, Ashford pulled a gun on Lewis, who remained in the doorway of his bedroom.  As the second assailant was approaching Lewis's uncle, Ashford looked away from Lewis briefly.  As he did, Lewis ran back into his bedroom, shut the door, and ran out of the apartment through a window.  While Lewis was fleeing, he heard a single gunshot.  Lewis asked a neighbor to call the police and an ambulance but did not speak to the police about the incident until 2 days later.  Lewis went directly to the hospital where his uncle was taken and found out that his uncle had died.  Lewis explained that he had hesitated to speak to the police because of an outstanding warrant.  

Investigating detective Ray Kaminski testified that on the day of the shooting, after speaking to members of Lewis's family, he was looking for two men: "Tim" and "Tony."  The two were later identified as Timothy Wash and Antoine Ashford.  Lewis and Kaminski both testified that on September 24, 1996, Lewis himself spoke with the police.  Detective Kaminski testified that Lewis did not give him the name or nickname of the second man to enter the apartment and gave him only a general description.  On September 25, Lewis identified Timothy Wash as another area resident whom Lewis had heard was in the lobby of the apartment building during the shooting.  At this time, Lewis also identified Antoine Ashford in a police line-up.

 On September 24, Detective Kaminski questioned Timothy Wash.  In opening statement, the prosecutor told the jury that after questioning Wash, the police were looking for defendant under the alias "Little Rib."  The prosecutor went on to say that after interviewing both co-defendants, police were again looking for defendant.  During direct examination, the State returned to this point and elicited from Detective Kaminski that after questioning Wash, he continued his search for Ashford and began searching for a man known as "Little Rib."  Kaminski brought Ashford in for questioning later that day and re-interviewed Wash.  On further direct examination, the State elicited that at this point Kaminski discovered that "Little Rib" was the nickname of defendant Willie Sample.  The State went on to elicit similar testimony from another officer assigned to the investigation, Charles Daly.  Daly reiterated that after speaking to the co-defendants, he and Kaminski were looking for defendant.  A full discussion of the contents of the prosecutor's opening statement and the detectives' direct examinations follows in the analysis section of this opinion.

On September 26, defendant was located and brought to the station for questioning.  While defendant was at the station, Darnell Lewis identified him out of a line-up as the man who had pointed a gun at Lewis's uncle.  Defendant also gave oral statements to both Detective Kaminski and to an assistant State's Attorney.  Each testified that defendant told them that he and Ashford had planned to rob Price and that Wash was to stand as lookout.  When they arrived at Price's apartment, Ashford pretended to be interested in buying marijuana from Price and at some point during the transaction pushed his way into the apartment.  Defendant asserted that he then entered the apartment, gun in hand, and went to take the drugs on the couch.  Price grabbed defendant's arm and the gun went off, hitting Price in the abdomen.  Defendant and Ashford took the drugs and left the apartment.  During opening statement, the prosecutor characterized this interview with defendant as one in which the police, having already spoken with his co-defendants, were giving defendant a chance to tell "his side of the story."

The State's forensic pathologist testified that Price died from a single gunshot wound to the abdomen and that there was no evidence of close-range firing.  The jury convicted defendant of first degree murder, home invasion, and armed robbery.  This appeal followed.

ANALYSIS

Defendant argues that comments made by the State during opening statement, and testimony the State elicited from Kaminski and Daly, improperly revealed that co-defendants Wash and Ashford had implicated defendant in their statements.  Defendant asserts that these incidents reflected a continuous and highly prejudicial attempt by the State to put inherently unreliable and damaging hearsay evidence before the jury in violation of defendant's sixth amendment right to a fair trial and right to confront witnesses. 

In response to defendant's argument, the State first asserts that defense counsel's failure to object either during opening statement or during the testimony of the two police detectives constitutes waiver.  Generally, to preserve errors for appeal, they must be objected to during trial and specified in a post-trial motion.  
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).  This waiver rule, however, endures two limitations.  First, the rule limits only the parties, not the courts, and a reviewing court may ignore the waiver rule in order to achieve a just result. 
People v. Lopez
, 152 Ill. App. 3d 667, 676, 504 N.E.2d 862 (1987).  Second, the plain error doctrine provides that errors involving alleged violations of constitutional rights may be reviewed when the error affects defendant's "substantial rights."  134 Ill.2d R. 615(a).  Because we have discretion to review waived claims, and because defendant's assertions touch questions involving substantial rights, we will proceed to the merits. 

Defendant alleges that the State's opening statement and testimony by investigating officers violated his Sixth Amendment rights as outlined in 
Bruton v. United States
, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).  In 
Bruton
, petitioner and a co-defendant were tried jointly for armed robbery.  The co-defendant did not take the stand.  The Supreme Court found that the admission of testimony by a postal inspector that the co-defendant had confessed and implicated the petitioner violated the petitioner's right to confront and cross-examine witnesses against him.  
Bruton
, 391 U.S. at 137, 88 S.Ct. at 1628.  The Court stated that the incriminations of a co-defendant are not only "devastating to the defendant but their credibility is inevitably suspect * * * [and] [t]he unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination."  
Bruton
, 391 U.S. at 136, 88 S.Ct. at 1628.  The Court found that the instruction to the jury to disregard the confession in determining the petitioner's guilt was simply impossible for a reasonable juror to follow.  
Bruton
, 391 U.S. at 127, 88 S.Ct. at 1623.  Thus the 
Bruton
 Court teased out the constitutional implications of the hearsay rule in situations where the out-of-court statement includes the inculpatory claim of a co-defendant. 

Illinois courts responded to 
Bruton
 by finding that testimony by witnesses recounting the inculpatory substance of conversations with non-testifying persons (often, but not always, co-defendants) could be reversible error.  
People v. Gacho
, 122 Ill.2d 221, 522 N.E.2d 1146 (1988); 
People v. Reeves
, 271 Ill. App. 3d 213, 648 N.E.2d 278 (1995); 
People v. Williams
, 159 Ill. App. 3d 612, 513 N.E.2d 415 (1987).  Our supreme court held that when the substance of the conversation with the declarant goes to the essence of the dispute at trial "it would inevitably go to prove the matter asserted" were a witness permitted to recount it.  
People v. Jones
, 153 Ill.2d 155, 160, 606 N.E.2d 1145, 1147.  

An exception to this doctrine developed, however, for police officers testifying to the procedures undertaken during their investigations.  As one court recognized: 

"In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct."  
People v. Cameron
 189 Ill. App. 3d 998, 1004, 546 N.E.2d 259 (1989) (quoting McCormick, Evidence § 249 at 734 (3d ed. 1984)).

Courts found that statements used to explain the progress of the police investigation are not offered to prove the truth of the matter asserted and are therefore not hearsay.  
People v. McCoy
, 238 Ill. App. 3d 240, 248-49, 606 N.E.2d 245, 251 (1992).   Likewise, "[a] police officer may testify that a conversation with an individual took place and he acted thereon because such testimony is within the officer's personal knowledge" and is not hearsay.  
People v. Pryor
, 181 Ill. App. 3d 865, 870, 537 N.E.2d 1141 (1989).  

For example, in 
People v. Gacho
, an investigating officer testified that he spoke to the victim in the hospital and then he went to look for Robert Gacho, the defendant.  
People v. Gacho
, 122 Ill.2d 221, 522 N.E.2d 1146 (1988).  Our supreme court held that the testifying officer did not reveal the substance of the conversation but merely explained his actions during the investigation.  The 
Gacho
 court, among others, has cautioned that testimony that recounts the 
substance
 of a conversation is not within the officer's knowledge and is inadmissible hearsay (emphasis added)."  
Gacho
, 122 Ill.2d at 248, 522 N.E.2d at 1160; 
People v. Pryor
, 181 Ill. App. 3d at 870, 537 N.E.2d 1141.  In the leading case involving statements of co-defendants, 
People v. Johnson
, 116 Ill.2d 12, 24, 506 N.E.2d 563, 568 (1987), the trial judge permitted the State to ask the investigating officer to name the person that two co-defendants had implicated as the shooter.  The officer named the defendant.  Our supreme court held that this testimony directly affirmed that co-defendants had identified the defendant as the gunman and was therefore impermissible.  
Johnson
, 116 Ill.2d at 24, 506 N.E.2d at 568.  The court noted that such a revelation went well beyond the investigative process hearsay exception.  

Courts have also warned that the potential "misuse" of this exception is great and that an officer's testimony "that he acted 'upon information received,' or words to that effect, should be sufficient." 
Cameron
 189 Ill. App. at 1004, 546 N.E.2d 259 (quoting McCormick, Evidence § 249 at 734 (3d ed. 1984)).   Balancing the need for police to explain their investigative process against defendants' right not to have the highly prejudicial statements of a co-defendant introduced as hearsay is our ultimate goal.  This can be accomplished only when the officer does not reveal the substance of a conversation with a co-defendant and merely outlines the steps taken in a police investigation.  As was the case in 
Gacho
, the testimony should be limited to the fact that there was a conversation, without disclosing its content, and to what the police did after the conversation concluded. It is this distinction between a description of the investigative process and the disclosure of the substance of an investigative conversation that we have to mind.  The boundary between the two is at best tenuous, even under the most guarded conditions, and can easily be breached by excessive emphasis as well as excessive disclosure.  

Defendant directs our attention to the following colloquy between the State and investigating detective Ray Kaminski:

"Q: Were you looking for anybody or any people when you went out with Timothy Wash after you had interviewed him?

A: We were.

Q: How many people were you looking for?

A: Two.

Q: Did you have names or identities of the people you were looking for at that time?

A: We had names and a photo of one. We had a nickname of another. 

Q: Who was the name of the person you were looking for who you had a full name for?

A: Antoine Ashford.

Q: What was the nickname of person for whom you had a nickname?

A: Little Rib.

Q: I am sorry?

A: Little Rib.

Q: At that particular time, did you know the full name of Little Rib?

A: No sir. 

***

Q: When you got back to Area 4, was Timothy Wash re-interviewed by Chicago police detectives?

A: He was.

Q: Was Antoine Ashford interviewed at Area 4 by Chicago police that evening?

A: He was.

Q: After Wash and Ashford were interviewed that evening, were you still looking for a third offender?

A: We were.

Q: At that time, did you have a full name for the third offender for whom you were looking for?

A: Yes, sir.

Q: What was that name?

A: Willie Sample. 

Q: I am sorry?

A: Willie Sample.

Q: Did he have an alias?

A: Yes.

Q: What was his alias?

A: Little Rib."

We agree with defendant that this colloquy is disturbing.  The State repeatedly elicited testimony that contained a strong inference that Wash and Ashford had implicated defendant in their statements.  The State did not simply conduct a 
Gacho
-style exchange concerning the process of investigation, but asked serial questions to build the inference that defendant was named by his criminal cohorts.  The State went even further when it used references to Wash's and Ashford's statements to build a link between defendant and the nickname "Little Rib."  This link was an important piece of substantive evidence in the State's case.  As the 
Johnson
 court held, "the substantive use of [] evidence" that assists the State in meeting its basic burden violates defendant's confrontation rights.  
Johnson
, 116 Ill.2d at 28, 506 N.E.2d at 570.

On redirect, the State elicited testimony amounting to an even stronger inference that Wash and Ashford had implicated defendant.

"Q: Even before you spoke with Darnell Lewis, you were looking for the defendant, correct?

A: Yes, sir.

Q: You had already spoken with Timothy Wash and Antoine Ashford, correct?

A: Yes, sir."

Although the State was attempting to rebut the defense counsel's effort on cross-examination to reveal the limits of Lewis's initial statements to police, this does not alleviate the concerns raised in admitting hearsay.  The State went on to elicit similar testimony from a second officer, Charles Daly.  Daly explained that after speaking with Timothy Wash and Antoine Ashford, they were looking for someone nicknamed "Little Rib."  Although the State's line of questions to Daly were much closer to those the 
Gacho
 court approved, the repetition of the inference raised by Kaminski's testimony compounds our concern about sixth amendment violations.

The State counters that courts have recognized that even when police testify about their investigative process, inferences as to the content of declarant's statement may arise.  For example, the 
Johnson
 court noted that police testimony which "might suggest that nontestifying witnesses implicated the defendant" may be admissible. 
Johnson
, 116 Ill.2d at 24, 506 N.E.2d at 568.  While we acknowledge that the very existence of this hearsay exception preordains that some inferences will be put before the jury, this case involves more than a mere suggestion that Wash and Ashford implicated the defendant.

Defendant goes on to argue that not only did the examination of these officers reveal the substance of the conversation between police and co-defendants, but that the State's opening statement exacerbated the hearsay effect of this testimony.  During opening, the prosecutor stated: "And after Chicago police spoke with Timothy Wash, they were looking for the defendant who was known as Little Rick [sic]. * * * They re-interviewed Timothy Wash.  After Timothy Wash and Antoine Ashford were interviewed, the police were again looking for the defendant Willie Sample, also known as Little Rick [sic]."  The State repeats the implicating reference twice in opening statement and then goes on to explain defendant's own statement in language that reinforces the implication.  The prosecutor stated that detective Kaminski would testify that he told Sample that he had already spoken to Ashford and Wash and that he was giving "the defendant a chance to give [] his side of the story of what happened to Jeremy Price..."  The prosecutor said that defendant "admitted yes, that he had gotten together with his friends Timothy Wash and Antoine Ashford; and yes, they had planned to rob the victim in this case of cannabis; and yes, he armed himself with a handgun; and yes, Timothy Wash was going to be the look out..."  Defendant argues that these statements, particularly with the repetition of "yes" and the phrase "his side of the story," unduly revealed to the jury the substance of Wash's and Ashford's statements.  We are inclined to agree.

Cataloging the repeated instances during which the jury was encouraged to infer that Wash and Ashford implicated defendant, suggests that the State stretched the boundaries of the investigative procedure hearsay exception
.  The inferences go to the "essence of the dispute" (the identity of the shooter) and the comments and testimony go beyond the basic exchange permitted in 
Gacho
.  More than simple police procedure is implicated in this record.

We recognize that case law is replete with examples of more egregious violations of the exception.  
Gacho
 122 Ill.2d 221, 522 N.E.2d 1146 (prosecutor's statement in closing argument that the officer learned the defendant's name "from the victim's lips" was improper);
 
People v. Reeves
, 271 Ill. App. 3d 213, 648 N.E.2d 278 (1995) (prosecutor used both opening and closing to reveal in detail the substance of a conversation between a witness and the non-testifying co-defendant implicating the defendant); 
People v. Armstead
, 322 Ill. App. 3d 1, 7, 748 N.E.2d 691, 697 (2001) (prosecutor included questions such as, "When you spoke to her, did you learn the identity of the shooter?" and "Who did you learn the shooter was?").  Furthermore, an Illinois court has sanctioned a colloquy in which the State asked "would it be fair to characterize the status of the suspects in the case [after speaking to a non-testifying declarant] as not only being Curtis Crawford * * * but also being [the defendant]?"  
People v. Henderson
, 142 Ill.2d 258, 302, 568 N.E.2d 1234 (1990). 

On balance, however, the repetition of strong inferences that his co-defendants implicated defendant in the crimes, the use of those statements to build a substantive link in the State's case, and the State's several comments on the upcoming testimony during opening statement, lead us to conclude that the boundaries set for the investigative process hearsay exception were breached.  

This conclusion does not end our analysis, however.   Confrontation errors, although constitutional violations subject to plain error review, do not automatically warrant reversal.   
Johnson
, 116 Ill.2d at 28, 506 N.E.2d at 570; 
see also
 
Lee v. Illinois
, 476 U.S. 530, 106 S.Ct 2056, 90 L.Ed.2d 514 (1986).  These errors are harmless when "'properly admitted evidence is so overwhelming that no fair-minded jury could reasonably have voted to acquit the defendant.'"  
People v. Singletary
, 273 Ill. App. 3d 1076, 1086, 652 N.E.2d 1333, 1340 (1995) (quoting 
People v. Yates
, 98 Ill.2d 502, 541, 456 N.E.2d 1369 (1983)).  Specifically, admission of hearsay is harmless if there is no "reasonable possibility the verdict would have been different had the hearsay been excluded."  
McCoy
, 238 Ill. App. 3d at 249; 
see also
 
People v. Warlick
, 302 Ill. App. 3d 595, 601, 707 N.E.2d 214, 219 (1998).

In this case, Darnell Lewis identified defendant both in a line-up and in the courtroom as the man who came into the apartment and pointed a gun at the victim.  Defendant himself confessed to shooting the victim and stealing the drugs.  Defendant's assertion that the gun went off during a struggle with the victim was refuted by uncontested testimony from the State's forensic expert that the victim was not shot at close range.  This evidence leads us to conclude that any error in admitting hearsay was harmless beyond a reasonable doubt.  

We therefore affirm defendant's convictions for first degree murder, home invasion and armed robbery.  As to defendant's ineffective assistance of counsel claim, we have concluded that even were the hearsay evidence objected to and excluded, the remaining evidence against  defendant was overwhelming.  Because we find any error harmless beyond a reasonable doubt, we will not further address this claim.

Defendant also argues that Jeremy Price's homicide does not qualify as "the severe bodily injury" required for mandatory consecutive sentencing under 730 ILCS 5/5-8-4.  Defendant contends that section 5-8-4 is inapplicable when the triggering offense, a Class 1 or Class X felony, is neither the source of nor proximately connected to the serious bodily harm.  Defendant argues that the murder was not proximately related to either the home invasion or the armed robbery.  We disagree.

At the outset, the State contends that defendant's failure to file a timely post-sentencing motion in the trial court waived this issue.  Section 5-8-1(c) of the Unified Code of
 Corrections
 
requires the filing of a post-sentencing motion to preserve sentencing issues for review.  Defendant argues, and the record reflects, that defendant did file such a motion.   Regardless, the requirement remains subject to the plain error doctrine which allows this court to review sentencing errors that affect substantial rights.  "The right to be lawfully sentenced is a substantial right.  [citation]  Thus, impermissible or illegal sentences may be attacked on appeal as plainly erroneous" even in the absence of a post-sentencing motion.
  
People v. Whitney
,
 297 Ill. App. 3d 965, 967, 697 N.E.2d 815, 817 (1998)
.  Because the defendant alleges that his sentences violate the law, we will look to see if the trial court committed plain error in this case.  

We must therefore decide whether defendant was subject to consecutive sentences under section 5-8-4(a) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a) (West 1996)).  Section 5-8-4(a) provides in pertinent part:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or a Class 1 felony and the defendant inflicted severe bodily injury * * *."

Defendant argues that the home invasion was completed prior to the infliction of injury.  In a similar manner, defendant claims that the armed robbery did not commence until after the shooting and thus the serious bodily injury did not occur during, nor was it proximately connected to, either of the offenses that triggered mandatory consecutive sentencing. 

In 
People v. Whitney
, 188 Ill.2d 91, 720 N.E.2d 225 (1999) the Illinois supreme court addressed the required relationship between bodily injury and triggering offenses.  Testimony in 
Whitney
 revealed that the defendant shot into a car containing two passengers, one of whom was killed and the other of whom was not injured.  The defendant in 
Whitney
 was convicted of first degree murder and of aggravated discharge of a weapon toward the unhurt passenger.  The defendant was sentenced to serve his terms consecutively.  Our supreme court held that the aggravated discharge offense did not result in severe bodily injury to the victim of 
that
 felony and thus that consecutive sentences were impermissible.  
Whitney
, 188 Ill.2d at 98-99, 720 N.E.2d at 230. The court held that to trigger consecutive sentences under section 5-8-4, the defendant must be convicted of either a Class X or a Class 1 felony "during the commission" of which defendant inflicts severe bodily injury on the same victim. 
Whitney
, 188 Ill.2d at 98-99, 720 N.E.2d at 230.

In this case, there is only one victim and thus the first prong of 
Whitney
 is satisfied.  However, the facts here do force us to confront the precise definition of the 
Whitney
 court's phrase "during the commission" of the triggering felony.  The question presented to us is: did the shooting of Jeremy Price occur "during the commission" of either the triggering offense of armed robbery or home invasion?

Although the 
Whitney
 court recognized that several appellate courts had used the language of "proximate connection" between the triggering felony and the injury, its adoption of the phrase "during the commission" of the felony indicates that this is the preferred vocabulary.  To help us understand the dimensions of this phrase, the 
Whitney
 court held that section 5-8-4(a) is not meant to be limited to those felonies in which injury is an inherent factor.  The court noted that such a reading would be too restrictive.  
Whitney
, 188 Ill.2d at 98-99, 720 N.E.2d at 230.  At the same time, the court recognized that "circumstances in which consecutive sentences are mandatory are exceptions to the general rule prohibiting such sentences when offenses are committed as a single course of conduct."  This cautions us from too broad a reading of the "during the commission" language. 

The State argues that the 
Whitney
 standard should direct us to death sentence jurisprudence to determine the timing of offenses.  Because the timing of the killing is crucial to the determination of whether the crime is a felony-murder, and therefore whether the defendant is eligible for the death penalty, a number of cases have discussed this issue.  We agree that it would be wise to consider these cases before embarking upon an uncharted route.
(footnote: 1)
 In 
People v. Richardson
, the supreme court addressed the applicability of the death penalty under 720 ILCS 9-1(b)(6)(c).   The defendant in 
Richardson
 announced the robbery up of a store as he was in the process of shooting the clerk, but before he took the money out of the register.  The 
Richardson
 court upheld the defendant's conviction over his claim that the shooting was not committed "in the course" of the armed robbery because the shooting took place before the robbery commenced.  The court held that "[j]ust as the phrase 'in the course of' does not require that defendant complete one of the other felonies in order to be eligible for the death sentence [citation] we also believe that it does not require that the armed robbery commence prior to the fatal gunshot."  
Richardson
, 123 Ill.2d at 359, 528 N.E.2d at 627-28.  The court went on to emphasize that the 

"precise timing of the offenses is not necessarily indicative of defendant's intent.  The jury concluded beyond a reasonable doubt that the defendant committed both a murder and an armed robbery, which offenses occurred essentially simultaneously."  
Richardson
, 123 Ill.2d at 359, 528 N.E.2d at 627-28. 

Numerous times our supreme court has reiterated its holding in 
Richardson
 and found that the precise timing of the elements of a crime was not dispositive of punishment under the felony-murder statute.  
People v. Flores
, 128 Ill.2d 66, 96-97, 538 N.E.2d 481 at 493 (1989) (noting that "it is of no significance here [] that the armed robbery did not commence prior to the fatal gunshots").  
See also
, 
People v. Thomas
, 137 Ill.2d 500, 533, 561 N.E.2d 57, 70 (1990); 
People v. Hampton
, 149 Ill.2d 71, 89, 594 N.E.2d 291, 299 (1992).
 

We are persuaded, based on these cases, and the record in the instant case, including the defendant's oral statement, that the crimes at issue occurred "essentially simultaneously." Defendant admitted that at the outset and throughout the crime, his intent was to rob the victim of drugs.  Within the course of a few minutes, defendant, and those for whose actions he was held criminally responsible, entered Price's home by force, threatened him with a weapon, shot him, and stole his drugs.  To parce the crimes out into bounded acts would contradict the reality that these crimes were intertwined both temporally and functionally.

Defendant argues that we should look to 
People v. Strickland
, 154 Ill.2d 486, 609 N.E.2d 1366 (1992), to determine the timing of the severe bodily injury in this case.   In 
Strickland
, the defendant shot and killed a police officer and then took the officer's gun.  The court noted that stealing the weapon was armed robbery but that it did not involve severe bodily injury for the purposes of 730 ILCS 5/5-8-4.  
Strickland
, 157 Ill.2d at 540-41, 609 N.E.2d at 1389.  The court gave no analysis of this holding however and subsumed it in a substantial discussion of the dispositive issue in the case--single course of conduct.  In the instant matter, neither side challenges that the crimes were part of a single course of conduct and thus the holding in 
Strickland
 is inapposite.

Defendant also relies on 
People v. Medrano
, 282 Ill. App. 3d 887, 669 N.E.2d 114 (1996), in which the court, again without elaboration, held that there was no proximate connection between the defendant's armed robbery or kidnapping of the victim and his later attempt to murder her.  The coincidence of the crimes is not set out in 
Medrano
, but even if 
Medrano's
 implicit definition of proximate connection requires greater propinquity than the "in the course of" standard, it is present on the facts of the instant case. 

We therefore affirm defendant's consecutive sentences of 35 years for first degree murder and six years each for armed robbery and home invasion. 

Defendant next argues that because the jury was instructed on first degree murder and felony-murder and returned only a general verdict of guilty, defendant's convictions for home invasion and armed robbery should be vacated as lesser included offenses of felony-murder.  As the defendant concedes, the Illinois supreme court has addressed this issue and reached a contrary conclusion.  

In 
People v. Cardona
, 158 Ill.2d 403, 634 N.E.2d 720 (1994), the defendant was charged with both intentional and felony-murder.  The defendant argued that a general verdict did not support the inference that the jury found him guilty of intentional murder and thus that the trial court's sentence based on the higher charge was in error.  The 
Cardona
 court noted that "a general finding of guilty is presumed to be based on any good count in the indictment to which the proof is applicable."  
Cardona
, 158 Ill.2d at 411, 634 N.E.2d at 723.  The 
Cardona
 court went on to re-affirm that "it is well established in Illinois that where an indictment contains several counts arising out of a single transaction and a general verdict is returned, the effect is that the defendant is guilty as charged in each count to which the proof is applicable."  
Cardona
, 158 Ill.2d at 411, 634 N.E.2d at 723.  This has become known as the "one good count rule."  In addition, "where multiple convictions are obtained for offenses arising out of a single act, sentence is imposed on the most serious offense."  
Cardona
, 158 Ill.2d at 411, 634 N.E.2d at 724.

In this case, defendant was charged with and the jury was instructed on both intentional murder and felony murder.  Defense counsel did not object to the submission of a general verdict form nor is there any evidence in the record that counsel tendered alternative verdict forms requiring the jury to find him guilty or not guilty of felony-murder.  The State's proof was applicable to both charges and the jury returned a general verdict of guilty of first degree murder.  The most serious of the first degree murder charges in this case is the one with the most culpable mental state: intentional murder.  
Cardona
, 158 Ill.2d at 411, 634 N.E.2d at 723-24.  Under 
Cardona
, therefore, this charge was the appropriate the basis for sentencing.  

Although defendant is correct that armed robbery and home invasion are lesser included offenses of felony murder, neither is a lesser included offense of intentional murder.  Thus even if the consecutive sentences would have been inappropriate for a specific verdict on felony murder, the "good count" of intentional murder renders the sentences proper. 

Although defendant invites us to reconsider 
Cardona
 in light of previous decisions by the United States Supreme Court, we feel obliged under the principle of 
stare decisis
 to decline defendant's invitation.  
People v. Gersch
, 135 Ill.2d 384, 396, 553 N.E.2d 281, 286 (1990).  

Defendant next argues that his consecutive sentences imposed under section 5-8-4 are unconstitutional under the United States Supreme Court's holding in 
Apprendi v. New Jersey
, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).  In 
Apprendi
, a New Jersey hate crime statute allowed the sentencing judge to increase a sentence beyond the statutory maximum if the judge found, by a preponderance of the evidence, that the defendant committed the crime to intimidate the victim on the basis of race.  The 
Apprendi
 court invalidated this provision of the law, holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." 
Apprendi
, 530 U.S. at 490, 120 S.Ct at 2362-63.  Defendant argues that consecutive sentences based on a judicial "finding" that severe bodily injury was inflicted during the commission of a felony is contrary to 
Apprendi
.  

In a decision issued subsequent to the filing of briefs in this case, the Illinois Supreme Court addressed this precise argument.  
People v. Carney
, 196 Ill.2d 518, 752 N.E.2d 1137 (2001).  The 
Carney
 court began by noting that "[w]hile, undeniably, a defendant who receives consecutive sentences will serve a longer period of imprisonment than a defendant who receives identical concurrent sentences, this fact alone does not make 
Apprendi
 applicable."  
Carney
, 196 Ill.2d at 531, 752 N.E.2d at 1145-46.  The court reasoned that section 5-8-4 affects only the "manner" in which a defendant must serve discrete sentences for discrete offenses and thus does not expose defendants to punishment that exceeds the statutory maximum.  
Carney
, 196 Ill.2d at 532-32, 752 N.E.2d at 1146.  According to the court, consecutive sentences have long been considered separate sentences under Illinois law.  When considering whether a given sentence improperly increases the penalty beyond the statutory maximum under 
Apprendi
, therefore, each sentence must be examined individually, even if the sentences are to run consecutively.  As the court succinctly concluded: "[c]onsecutive sentences, taken together, do not constitute a 'range of penalties' to which 
Apprendi
 applies."  
Carney
, 196 Ill.2d at 534-35, 752 N.E.2d at 1146.  

Because defendant in the case at bar was not sentenced to more than the statutory maximum for any one of the offenses for which he was convicted, we will uphold his consecutive sentences under 
Carney
.

Finally, defendant asserts that his sentences must be vacated and made to run concurrently because serious bodily injury is inherent in the first degree murder charge and under 
People v. Miller
 193 Ill. App. 3d 918, 552 N.E.2d 988 (1996) using this same factor to mandate consecutive sentences would constitute a double enhancement.  In 
Miller
, the court held that when severe bodily injury is inherent in the predicate offense, using the same injury to trigger consecutive sentencing impermissibly counts that injury twice: once in the establishment of the crime and again in the mandatory consecutive sentence.  
Miller
 193 Ill. App. 3d at 931-32, 552 N.E.2d at 996-97.

We find defendant's argument under 
Miller
 unpersuasive, first, because unlike the facts in 
Miller
, in the instant case  the severe bodily injury was not inherent in either of the predicate offenses (home invasion or armed robbery) triggering consecutive sentencing.  Under 
Miller
, then, we find no double enhancement.  Furthermore, a brief examination of the supreme court's recent decisions in 
Whitney
 and 
Carney
 also reveals that section 5-8-4 does not raise a double enhancement problem in this case.  As the 
Carney
 court held in determining whether consecutive sentences are controlled by 
Apprendi
, consecutive sentences affect only the manner in which the sentence is served; they do not alter the range of punishment for a given crime.  
Carney
, 196 Ill. 2d at 531-32, 752 N.E.2d at 1144-45.   Logically then, such sentences do not "enhance" punishment at all.  And as the 
Whitney
 court held, crimes in which severe bodily injury is inherent and crimes in which severe bodily injury is not inherent can both act as triggering offenses under section 5-8-4.  The 
Whitney
 court thus implicitly rejected the premise of 
Miller's
 double enhancement objection in concurrent sentence cases.  Reading 
Carney
 and 
Whitney
 together, we find that the trial court did not err in imposing consecutive sentences in the instant case. 

Defendant and the State agree that the mittimus incorrectly states that he is entitled to only 899 days credit for time served.  Defendant is in fact entitled to 999 days credit.  Remand is unnecessary because this court has the authority to order the clerk of the circuit court to make the appropriate corrections.  
People v. McCray
, 273 Ill. App. 3d 396, 403, 653 N.E.2d 25, 29 (1995).  Accordingly, we direct the clerk to amend the mittimus to reflect that the defendant has 999 days credit for time served.

CONCLUSION

We affirm defendant's conviction and his sentence of 35 years for first degree murder, six years for armed robbery, and six years for home invasion, to be served consecutively.  We order the mittimus amended to reflect 999 days served. 

CAHILL, J., specially concurring,

McBRIDE, J., specially concurring.

JUSTICE CAHILL, specially concurring:

I concur in the disposition of this case and with almost all of the reasoning of the author of the opinion.  My one reservation concerns the analysis of the direct examination of Detective Ray Kaminski and the opening statement of the prosecution.  The author joins these excerpts from the record to make the argument that "the State stretched the boundaries of the investigative procedure hearsay exception."  Slip op. at 13.  I cannot agree.  The best analysis of this issue, in my view, is contained in the 
Henderson
 decision cited in the opinion: 

"This court has held that testimony recounting the steps taken in a police investigation is admissible and does not violate the sixth amendment, even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratuitously reveal the substance of their statements and so inform the jury that they told the police that the defendant was responsible for the crime.  [Citation.]  The testimony here merely related the conduct of the investigation; the fact that it appears that something Alonzo said caused the police to look for defendant does not mean that defendant had a right to cross-examine Alonzo–there was simply nothing to cross-examine him about, given that the content of his statement to the police was never disclosed at trial."  
People v. Henderson
, 142 Ill. 2d 258, 304, 568 N.E.2d 1234, 1256 (1990).

Here, as in 
Henderson
, the key to a sixth amendment analysis and the right of cross- examination is to ask a question: based on what was revealed by the officer's testimony, what would you cross-examine Wash and Ashford about?  The 
Henderson
 approach strikes me as a clear exposition of the view of our supreme court.  The alternative is to allow trial judges and appellate courts to weigh the prejudicial impact of inferences.  The latter approach, which I believe the author subscribes to, almost insures that there will never be uniformity in our opinions on this subject.

In all other respects I join in the opinion.

JUSTICE McBRIDE, specially concurring,

I also concur with the disposition of this case, however, I believe that the errors complained of by defendant regarding the prosecutor's opening remarks and the introduction of hearsay testimony during the examination of two detectives have been waived.

Because defendant did not make a timely objection to any of these errors at trial, and did not renew those objections in a written post-trial motion, the alleged errors have been waived.  
People v. Miller
, 173 Ill. 2d 167, 191, 670 N.E.2d 721 (1996).  

Defendant urges this court to review these errors under the plain error doctrine.  The plain error doctrine allows a reviewing court to consider a trial error not properly preserved when (1) the evidence in a criminal case is closely balanced, or (2) the error is so fundamental and of such a magnitude that the defendant was denied his right to a fair trial.  
Miller
, 173 Ill. 2d at 191-92. 

In my opinion, neither situation applies here.  The evidence was not closely balanced and the errors cannot be said to be so fundamental and of such a magnitude that the defendant was denied the right to a fair trial.  The type of testimony elicited by the prosecution in examining the detectives in this case has been permitted as part of the investigatory procedure exception.  
Henderson
, 142 Ill. 2d at 304.  Therefore, under these facts, I cannot agree that the introduction of such testimony affected defendant's substantial rights so as to permit review.

Defendant also argues that his trial counsel was ineffective for failing to object at trial and for not including these errors in the motion for a new trial.  This argument consists of two sentences and citation to three decisions in defendant's brief.  Defendant does not explain how his attorney's actions fell below an objective standard of reasonableness nor how a reasonable probability exists that but for counsel's errors the results would have been different.  
Strickland v. Washington
, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  As a result, this issue is also waived.  
People v. Nieves
, 192 Ill. 2d 487, 503, 737 N.E.2d 150 (2000).

For the above reasons, I believe defendant has waived consideration of these issues on appeal.

I concur in the rest of the opinion.

FOOTNOTES
1:
It should be noted, however, that the felony-murder standard is phrased differently than is the consecutive sentence standard outlined in 
Whitney
: the former in embodied the phrase "in the course of" 720 ILCS 5/9-1(b)(6) and the latter "during the commission of."  As we indicated above, however, an analysis of felony murder case law is instructive in determining whether the same substantive standard should be used in both circumstances.