2021 IL App (1st) 181962-U

SIXTH DIVISION
March 31, 2021

No. 1-18-1962

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 14012 |
| | ) | |
| DESMOND YOUNG, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The court finds no plain error because the evidence at trial was not closely balanced. The only preserved error resulted in the admission of purely cumulative evidence and was harmless. Defendant's convictions are affirmed.

¶ 2    A jury found defendant Desmond Young guilty of first degree murder and armed robbery and he was sentenced to a combined term of 96 years in prison. Over the course of a lengthy trial, the State presented the testimony of eyewitnesses; an extremely detailed account of Mr. Young's actions given by his then-girlfriend, who accompanied him throughout the day of the shooting and

to whom he admitted being the shooter; officer testimony corroborating much of the girlfriend's account; an audio recording of a telephone conversation made to Mr. Young while he was in jail for this murder, in which he and a friend, who was also an eyewitness, debated who had seen him and who "kn[e]w about it"; and forensic evidence consistent with Mr. Young being the shooter. Although four of the State's witnesses recanted at trial, maintaining that they had no memory of the day of the shooting, the State was able to introduce those witnesses' prior accounts, which corroborated the State's other evidence.

¶ 3    On appeal, Mr. Young argues that the trial court erred by (1) allowing the State to elicit and reference in its closing arguments testimony conveying the substance of an anonymous call made to the police that the court had allowed into evidence for the limited purpose of explaining the course of the officers' investigation; (2) allowing evidence of gunshot residue found on a pair of jeans Mr. Young purportedly wore during the shooting where the State failed to take reasonable measures to ensure that the jeans had not been contaminated; (3) failing to properly admonish potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); and (4) allowing an inadmissible prior statement of one of the recanting witnesses, Frederick Giles, to be presented to the jury.

¶ 4    For the reasons that follow, we find that the unpreserved errors raised by Mr. Young cannot constitute plain error because the evidence at trial was not closely balanced. The sole preserved error, regarding prior inconsistent statements made by Mr. Giles, resulted only in the admission of cumulative evidence and was harmless. Accordingly, we affirm the judgment of the trial court.

¶ 5                                  I. BACKGROUND

¶ 6    Mr. Young was tried before a jury, during a week-long trial in April and May of 2018. The jury heard from close to 30 witnesses and were presented with over 150 exhibits. Mr. Young was

charged with the murder and robbery, at approximately 12:30 p.m. on January 6, 2012, of Olufemi Abdulai. The evidence at that trial was as follows.

¶ 7                                    A. The Events of January 6, 2012

¶ 8      Nicholas Koutsoukos testified that he knew the victim because they were both landlords with properties on the west side of Chicago. At around 11 a.m. on January 6, 2012, Mr. Koutsoukos drove to the 4400 block of Monroe Street to meet Mr. Abdulai. The two sat talking in Mr. Abdulai's car for a while. Mr. Abdulai was still sitting in the car when, after about 30 minutes, Mr. Koutsoukos returned to his own vehicle and drove off.

¶ 9      The victim's wife, Mosunmola Abdulai, testified that she was visiting family in Nigeria on January 6, 2012, but spoke to her husband by telephone at around 11 a.m., Central Standard Time. He told her he was going to collect rent and call her back. When she did not hear from him, she contacted a neighbor and learned that Mr. Abdulai had been robbed and shot. Ms. Abdulai testified that her husband drove a navy blue BMW X6 and owned two wallets: one ordinary leather and one alligator skin. When she returned home, she was only able to find his leather wallet.

¶ 10     Charrise Whittington testified that shortly before 12:30 p.m. on January 6, 2012, she was at her home on the south side of Monroe Street near Kilbourn Avenue when she heard gunshots. Through a north-facing, second-floor window, she saw a man wearing "a steel gray hoodie" walk away from a "[d]ark colored foreign car" and cross the street heading southeast. According to Ms. Whittington, the man's hood was up, he had "a face mask or something covering his face," and his hands were inside the hoodie. She lost sight of him momentarily because an awning blocked her view but then she saw him walking east on Monroe Street toward Kostner Avenue. When the man was about seven or eight houses away, he entered a gangway, heading south, and she again lost sight of him. A neighbor named Michelle then ran outside and yelled that a man had been shot.

Ms. Whittington acknowledged on cross-examination that she only observed the man in the gray hoodie "for a couple of seconds."

¶ 11     Tiesha Crayton, known as "Boss Lady," was serving a prison sentence for the manufacture and delivery of heroin. She testified that the State had not threatened her or made her any promises in exchange for her testimony. Ms. Crayton stated that at around 12 p.m. on January 6, 2012, she was selling drugs on the corner of Kilbourn Avenue and Monroe Street, with Keith Longstreet and a man she knew only as "Duka," when she received a telephone call from Mr. Young, who she had known for a year or two, telling her that he knew of a car for sale for $600. She told him to pick her up on Monroe Street, and 25 to 30 minutes later he drove up in a gray Buick Century, with his girlfriend Laura Perkins in the passenger seat. According to Ms. Crayton, Mr. Young, who at that time was wearing a gray hooded sweatshirt with the hood down, indicated to her that he was going to go around the block and proceeded to turn left on Kilbourn Avenue, entering the alley between Monroe and Wilcox Streets. His vehicle then disappeared from her sight.

¶ 12     At this time Ms. Crayton also had an unobstructed view of "Abdul," the landlord, whom she had known for a couple of years, talking on his phone as he stood outside of his vehicle, a BMW X5, which was parked four or five houses down on the other side of the street. The next thing Ms. Crayton saw was a man wearing a gray hoodie with the hood up and a black ski mask walking out of an uninhabited three-flat building about eight or nine houses down from where she stood. When asked what she knew about this building, Ms. Crayton said, "I know if the police chase me, I'm gonna run straight through it, cause ain't no gates back there." She explained that all of the other buildings along the alley running between Monroe and Wilcox Streets had gangways with locked gates. Ms. Crayton saw the man cross Monroe Street and approach Abdul, at which point the two "got to tussling" and the masked man fired two shots from a "[d]ark color"

gun. Abdul fell back into the driver's seat of his car. The masked man then retraced his steps to the gangway belonging to the three-flat. A neighbor called 9-1-1 and Ms. Crayton ran over and stayed with Abdul until an ambulance came. She did not wait for the police to arrive, though, stating "I didn't want to have nothing to do with that."

¶ 13    Ms. Crayton testified that immediately after the shooting she called Mr. Young twice, but he did not answer his phone. About 20 minutes later, however, he and Ms. Perkins—with Ms. Perkins driving this time—drove up to an empty lot on Wilcox Street where Ms. Crayton and 10 to 15 other people had gathered to shoot dice. An individual Ms. Crayton knew as "Bart" was sitting in the back seat. Mr. Young got out of the car and walked over to the game and Ms. Crayton asked him what had happened on Monroe Street. He would not answer her at first, saying "don't say my business out loud." But when she asked him again, he said, "I saw a lick, and I went for it." Ms. Crayton explained that a "lick" is "[s]omebody with some money." Mr. Young went on to say he "saw Abdul with a bankroll," the two "got to tussling," and "he had to shoot him." The conversation ended and Mr. Young returned to the passenger seat of the car.

¶ 14    Ms. Crayton agreed that before court that day the State had played for her a recording of a telephone conversation between her and Mr. Young that she believed took place a few days after the shooting, when Mr. Young was in jail. Ms. Crayton explained that she had received a call from Ms. Perkins, who connected her to Mr. Young. A clip from the recording was played for the jury in which Ms. Crayton says, "I told you Keith saw you" and "[w]e was at a dice game. Everybody, I swear to God, G. Everybody and them know about it." Mr. Young, in response, said, "ain't no mother f*** seen me. Ain't no mother f*** seen me but Keith. Keith saw me pulling out of the alley. That's it."

¶ 15    On cross-examination, Ms. Crayton acknowledged that she had been "on the run" for six

months because the police thought that she was involved in Mr. Abdulai's shooting. She first told them her version of events when they arrested her on June 26, 2012. When pressed by defense counsel regarding the details of her account, Ms. Crayton stated:

"It was seven years ago. I don't want to do this. This ain't what I want to do. I don't want to do this. All I know, it was a masked man. That's it, that's all. I'm ready to go. Take me back to my cell. That's all I know. I don't want to do this."

Ms. Crayton repeatedly asked to be taken back to her cell throughout the remainder of her cross-examination. When the judge told her she could step down, she said, "[t]ake me back. I didn't want to do this. You know I didn't want to do this shit, man."

¶ 16    Laura Perkins testified in a Cook County Department of Corrections uniform, explaining that she had previously failed to appear to testify in this case and had been taken into custody over the weekend. Ms. Perkins acknowledged that she hoped to be released from jail after she testified. She agreed, however, that the State had not made any threats or promises to her in exchange for her testimony and that the judge would decide if she would be released.

¶ 17    Ms. Perkins identified Mr. Young in court and testified that in January 2012 they were in a relationship, she was pregnant with his child, and he had been living with her for a few months. At around 12:25 p.m. on January 6, 2012, she and Mr. Young were out driving in her silver Buick Century. Mr. Young was driving, and Ms. Perkins sat in the front passenger seat. Mr. Young turned into the alley running behind Monroe Street near Kilbourne Avenue. He parked in an empty lot, exited the vehicle, and went down a gangway leading back to Monroe Street, at which point she lost sight of him. He did not tell her where he was going. According to Ms. Perkins, Mr. Young was wearing dark jeans, white gym shoes, and a "grayish" hoodie.

¶ 18    About 30 seconds later, Ms. Perkins heard approximately five gunshots. Mr. Young then

ran back with his hood pulled up, carrying a black revolver. Ms. Perkins denied, on direct examination, that Mr. Young had anything covering his face. On cross-examination, however, she testified that he put a ski mask on when he exited the vehicle, but she could not remember if he still had it on when he returned. And on redirect examination, she said she first saw Mr. Young wearing the ski mask when he was returning to the car after shots were fired. It was pulled down to cover his face, but he took it off when he got in the car.

¶ 19    Ms. Perkins asked Mr. Young what had happened, but he did not respond. Instead, he continued driving down the alley, made a right on Kostner Avenue, and continued to Jackson Boulevard, where he stopped the car, pulled a dark animal-skin wallet from his pocket, removed five $20 bills, and threw the wallet from the window of the car. Mr. Young then drove to an alley near where his grandmother lived at Jackson Boulevard and Cicero Avenue and took a phone call, after which he said, "[o]h, no. Isha (phonetic) said the man died—is dead." Ms. Perkins identified a photo of Isha, known as "Boss Lady," who she testified was a friend of Mr. Young's.

¶ 20    Mr. Young began to drive down the alley toward Kilpatrick Avenue when they came across two individuals Ms. Perkins knew only as "Little Man" and Josh, but whom she was able to identify from photographs. According to Ms. Perkins, Little Man and Mr. Young were cousins and Josh was a friend of theirs. Mr. Young stopped the vehicle and the two men got in the back seat. Mr. Young then drove to a gas station at Kostner Avenue and Harrison Street, where he exited the vehicle and had a conversation with someone Ms. Perkins knew only as "Big Shitty."

¶ 21    Mr. Young got back in the car and, at one point, said, "I think I killed someone. I think I shot that dude." When Little Man asked Mr. Young who he had shot, Mr. Young told him to stop asking questions and stay out of his business. They then dropped Little Man and Josh off at Raybon's tire shop.

¶ 22     Mr. Young then drove down Kostner Avenue to pick up someone named "Bratt." On the way, they were pulled over by the police. Mr. Young had no driver's license, so the officer asked Ms. Perkins, who did have one, to drive the car. The officer did not search the car and Ms. Perkins testified that she did not know at that point where the revolver that she had seen earlier was.

¶ 23     Ms. Perkins did not know Bratt's real name but identified him from a photograph. After they picked up Bratt, Mr. Young told Ms. Perkins, who was now driving, to go back to Monroe Street and Kostner Avenue. When they arrived there, they saw that the area was cordoned off with police tape and there were multiple police officers standing around. Mr. Young pointed at the crime scene as they drove by and said, "[t]his is what I be on," and "[t]his is my work." Bratt then asked to be dropped off and they let him out about a block away.

¶ 24     Ms. Perkins then drove Mr. Young to her apartment at 10 North Hamlin Avenue. They parked on the street, and Mr. Young was outside the car "rolling a blunt" when they were approached by two officers in an unmarked Crown Victoria "detective car." As the officers approached Mr. Young, he ran through the alley into a gangway. The officers chased him on foot until they apprehended and arrested him. Ms. Perkins was not questioned by the police at that time.

¶ 25     Six days later, on January 12, 2012, Ms. Perkins spoke to Sergeant Poley (phonetic) and some other detectives. She drove around with them, showing them the route that she and Mr. Young had taken on the day of the shooting. Ms. Perkins marked an aerial photograph of the area indicating the route for the jury. When Ms. Perkins and the detectives arrived back at her apartment, she gave them some jeans and white gym shoes that she said Mr. Young had worn on the day of the shooting. When asked when he took them off, she said "[t]he same day" and "[w]hen he went home," but when asked when that could have been, she could not remember. At some point after the shots were fired but before he was arrested, he went upstairs to change clothes, but

Ms. Perkins testified that she could not remember if she went with him. On recross-examination, however, Ms. Perkins said that she waited in her car for Mr. Young to change his clothes, and that this was just before they picked up Bratt. She did not ask him why he had to change his clothes. Ms. Perkins remembered that after the shooting, but before they picked up Little Man and Josh, Mr. Young had gone into his grandmother's house while she stayed in the car, but she stated that he had not changed his clothes there.

¶ 26    Ms. Perkins testified that she got the clothes for the police out of the dirty clothes hamper in her closet, that she and Mr. Young were the only ones living in the apartment at the time, and that no one else had worn the clothes since Mr. Young took them off. Ms. Perkins could not remember the name of the officer who took the clothes but stated that one of the police officers placed the items on the kitchen floor to be photographed. Ms. Perkins identified the jeans and shoes in court and stated that they were in the same or substantially the same condition as when she had last seen them.

¶ 27    Ms. Perkins's account was corroborated, in part, by the testimony of three Chicago police officers. Officer Shepard confirmed that he had stopped Mr. Young for running a red light while driving Ms. Perkins's car and had told her to drive, since Mr. Young did not have a license. He also testified that he had no reason, at that time, to search the car.

¶ 28    Officer Carter testified that, at around 2:50 p.m. on January 6, 2012, he and his partner, Officer Reed, were on plainclothes patrol in an unmarked squad car when they observed Mr. Young standing with a woman on the sidewalk near 100 North Hamlin Avenue and holding "an open cigar," which Officer Carter explained "normally is used to roll a blunt filled with cannabis." When the officers slowed their vehicle, Mr. Young walked up to the open passenger window and, according to Officer Carter, stated, "man, I got a little bit of weed. I was just about to roll it, f***

it." Officer Carter said that he "[j]ust kind of laughed" and watched as Mr. Young ripped up the cigar, letting what looked like cannabis fall to the ground. Mr. Young fled when Officer Carter began to open the car door and the officers pursued him in their vehicle.

¶ 29    Both officers testified that, as Mr. Young was running, they observed him reach underneath his coat, retrieve a handgun, and toss it over a wrought iron gate. Officer Carter testified that the gun was a blue steel revolver. Officer Reed explained that this meant the gun was "[d]ark ***  [b]asically like black" in color. Mr. Young then ran through a parking lot and hopped over a gate. Unable to follow him in their vehicle, Officer Reed began to chase Mr. Young on foot. Officer Carter went around the car to the driver's seat and reversed the vehicle 35 or 40 feet to retrieve the gun, which he saw was fully loaded with nine live rounds. He lost sight of the gun for only a few seconds as he walked around the car. No one else was near the gun. When Officer Carter caught up with his partner at 3801 West Madison Street, Officer Reed had already detained Mr. Young, who was charged with unlawful use of a weapon and possession of cannabis.

¶ 30    Officers Carter and Reed were aware that there had been a murder on the 4400 block of Monroe Street at around 12:30 p.m. and had in fact responded with other officers to the scene of that crime but had played no role in securing the crime scene or collecting evidence. Both stated that at the time they encountered Mr. Young they were not looking for a specific suspect and had no idea that Mr. Young might be connected with the earlier shooting. At the time of his arrest, Mr. Young was wearing a black Pelle Pelle-brand jacket, black gym shoes, black pants, a gray T-shirt with writing on it, and a New York Yankees skull cap.

¶ 31    On cross-examination, Officer Carter acknowledged that he had observed Mr. Young from a distance of 35 feet or more as Mr. Young ran away from him and could not be sure if he pulled the revolver from his waistband or from the front pocket of his coat.

¶ 32    Officer Alejandro Lagunas performed the post-arrest custodial search and found $80 loose in Mr. Young's pants pocket.

¶ 33                                B. The Investigation

¶ 34    Sergeant Bryan Holy testified that he supervises homicide detectives in the violent crimes unit of the Chicago Police Department. When asked how he became involved in the investigation of Mr. Abdulai's murder, Sergeant Holy stated: "I became aware of an anonymous phone call that was received by Sergeant Gilbert I believe on the 7th of January naming the offender in this homicide." Defense counsel objected and moved to strike this response and her objection was sustained. The trial court instructed the jury to disregard Sergeant Holy's response. The State then asked what the first thing was that Sergeant Holy did in connection with the investigation. The sergeant stated that he began searching police databases "in regards to that phone call that was received" for a specific automobile. The Sergeant testified that the automobile, a silver Buick Century registered to Ms. Perkins, was found at 4422 North Hamlin Avenue on the morning of January 12, 2012.

¶ 35    When asked on cross-examination what he knew about the anonymous caller, Sergeant Holy said that he understood from another officer's report that the caller had been a woman "who said if she would call back again, she would refer to herself as Kim," but who refused to give her real name or telephone number. To Sergeant Holy's knowledge, the person known as "Kim" never did call back.

¶ 36    Sergeant Holy testified that Ms. Perkins was interviewed regarding the shooting and signed a consent for police to search her apartment and vehicle. He did not perform a comprehensive search of the apartment but, over the course of 20 or 30 minutes, "went to where [Ms. Perkins] directed [him]." Ms. Perkins showed him a pair of "three-quarter height" Nike gym shoes and a

pair of blue denim "Rocawear jeans" in a hamper in the bedroom closet. Sergeant Holy testified that he did not touch these items but called evidence technician Bridget Cronin to photograph and recover them. Also present in the apartment at various times were Sergeant Gilbert, Detective Hall, and Detective Fuller.

¶ 37 When asked if Officer Cronin removed the jeans and gym shoes from the hamper, Sergeant Holy said he believed so. He did not move those items and, to the best of his knowledge, no one else was living there besides Ms. Perkins and Mr. Young. Mr. Young was in custody at the time the items were recovered. When asked specifically what Ms. Cronin did, Sergeant Holy stated, "I believe she took overall photographs of the apartment and then placed the clothing items on the floor, photographed them and then placed them into a brown paper evidence bag and then took them back to her unit of assignment and inventoried them." He did not see Ms. Cronin leave the apartment with those items. Sometime later that night or early the next morning, Sergeant Holy checked his computer and saw that the items had been inventoried.

¶ 38 On cross-examination, Sergeant Holy stated that although he was present in the apartment when the evidence technician recovered the jeans and shoes from the hamper, he did not instruct her to photograph them inside the hamper. He could not recall if there were other items in the hamper.

¶ 39 Sergeant Holy and two other detectives then "went on a tour" with Ms. Perkins, driving to specific locations that she directed them to. They began in the alley behind Mr. Young's grandmother's house and drove to the crime scene on Monroe Street, before returning to the police station. Sergeant Holy returned to the home of Mr. Young's grandmother, who permitted the police to search the apartment for a gray hooded sweatshirt. None was found. Nor did the police find shell casings at Ms. Perkins's home or at Mr. Young's grandmother's home.

¶ 40                    C. The Recanting Witnesses

¶ 41    Four of the State's witnesses—Frederick Giles, Joshua Jones, Eddie Dell, and Marshon Wilson—recanted their statements to the police and their grand jury testimony and, at trial, generally denied having any memory of the events of January 6, 2012.

¶ 42    Mr. Giles testified that Mr. Young was his cousin and that in 2012 he was acquainted with Mr. Jones. He did not remember giving a written statement to the police on January 18, 2012, or testifying before the grand jury on March 7, 2012, stating, "I don't even remember back then. I was getting high."

¶ 43    Mr. Jones, testifying while incarcerated for unlawful use of a weapon, escape, and delivery of heroin, stated that in 2012 he was friends with both Mr. Giles, who went by "Little Man," and with Mr. Young's brother, known as "Teddy Bear." Mr. Jones recognized his signature on each page of a May 18, 2012, written statement attributed to him but testified that he did not recall making the statement. He did not recall testifying before the grand jury that same day. Like Mr. Giles, Mr. Jones maintained that his memory had been affected by drug use.

¶ 44    Eddie Dell, who knew Ms. Crayton through a mutual friend, claimed not to have ever heard of Mr. Young until he spoke with an assistant state's attorney (ASA) about this case. Mr. Dell denied that he was standing with Ms. Crayton on the 4400 block of Monroe Street on January 6, 2012, and denied seeing the shooting. Mr. Dell testified that he was arrested on August 7, 2012, on an unrelated weapons charge, and was told by a detective that he could go home if he made a statement about the shooting in this case. Although he was ultimately convicted on the gun charge, Mr. Dell maintained that he was tricked into believing it would be dropped if he made the statement. Mr. Dell either could not recall or denied making each assertion in the written statement attributed to him.

¶ 45    Marshon Wilson stated that he knew Mr. Young in 2012. Mr. Wilson acknowledged that, in exchange for a five-year prison sentence, he had pleaded guilty to multiple charges that were pending against him at the time the police questioned him regarding this case. He denied giving them a written statement on January 11, 2012.

¶ 46    The State introduced the prior statements and, in some cases, grand jury testimony of these witnesses through the testimony of several ASAs. Only the admission of prior statements by Mr. Giles is at issue on appeal.

¶ 47    ASA Kathaleen Lanahan testified that she interviewed Mr. Giles on January 18, 2012, and he agreed to give a written statement. According to the statement, sometime after 12:30 p.m. on January 6, 2012, Mr. Giles was walking with Mr. Jones to pick up Mr. Giles's car, which was being repaired, when they flagged down Mr. Young and Ms. Perkins. They stopped at a gas station and Mr. Young exited the vehicle to talk to someone Mr. Giles knew as "Big Shitty." When Mr. Young got out of the car, Mr. Giles noticed that he had a black revolver in his waistband. At some point, Mr. Giles heard Mr. Young say, "I think I shot someone, I think I killed him, I shot [the] dude," and "I shot the guy on Monroe." When they arrived at the auto repair shop, Mr. Giles asked Mr. Young to borrow money to pay for his car and Mr. Young gave him $5. Mr. Giles could see that Mr. Young had several $20 bills in his pocket. According to ASA Lanahan, Mr. Giles reviewed this statement, which she wrote out by hand, made and initialed corrections, and signed each page.

¶ 48    ASA Ericka Graunke testified that she presented Mr. Giles to the grand jury on March 7, 2012, where he gave testimony consistent with his January 18, 2012, written statement. Mr. Giles again said Mr. Young stated he thought he had killed someone. Mr. Giles told the grand jury that when he asked Mr. Young who the guy was, Mr. Young "told me why am I in his business, stay the f*** out of his business, I talk too much." Mr. Giles told the grand jury that he saw Mr. Young

and Ms. Perkins drive by some time later with a man Mr. Giles did not recognize in the back seat of the car.

¶ 49    Mr. Jones's previous statement and his grand jury testimony were that his cousin, Mr. Giles, came over looking for some money to pay for his car repairs. In the early afternoon, Mr. Jones was walking with Mr. Giles to Raybon's Auto Shop when Mr. Giles flagged down Mr. Young, who was driving by in a gray Buick Century with his girlfriend in the passenger seat. Mr. Young agreed to drive them to Raybon's. On the way, he pulled into a gas station and exited the vehicle to talk to two people Mr. Jones knew only as "Big Shitty" and "Fat Man." At one point, Mr. Young turned the radio up and Mr. Jones could not hear any conversation. Mr. Giles asked Mr. Young for some money and he handed him a $20 bill. Mr. Jones saw that Mr. Young had some other $20 bills folded loose in his pocket. A short time after they were dropped off at Raybon's, Mr. Jones saw Mr. Young and his girlfriend drive by again in the same gray Buick.

¶ 50    Mr. Dell's previous statement was that on January 6, 2012, he was standing at the corner of Monroe Street and Kilbourn Avenue with "Fat Shorty," "Marky," and "Esha," who he knows as "Boss Lady," when Mr. Young drove by on Monroe Street. About five minutes later, Mr. Dell saw Mr. Young walk toward them wearing a hooded sweatshirt with the hood up and cross the street to approach the black BMW that Mr. Abdulai was sitting in. Mr. Dell saw Mr. Young point a black revolver at Mr. Abdulai, who put his hands over his head. Mr. Young then removed Mr. Abdulai from the car, patted him down, and shot him five times before running south through the gangway of a three-flat building. Mr. Abdulai fell back into the car and Esha ran over to assist him.

¶ 51    Mr. Dell began to run down Kilbourn Avenue toward Wilcox Street. As he crossed the alley running between Monroe and Wilcox Streets, he saw Mr. Young's silver car parked in the

alley behind the three-flat building. Mr. Dell met up a short time later with Mr. Longstreet, Esha, and some others in a vacant lot on Wilcox Street. Mr. Young later joined them, and Mr. Dell heard him say "ain't nobody seen me." Mr. Young then drove off in the silver car he had arrived in.

¶ 52   Mr. Wilson's previous statement was that he knew Mr. Abdulai because Mr. Abdulai owned a building on the 4400 block of Monroe Street and Mr. Wilson would occasionally see him around the neighborhood. On the afternoon of January 6, 2012, Ms. Perkins and Mr. Young came to Mr. Wilson's residence to pick him up. Ms. Perkins was driving. They drove west down Monroe Street and saw red and yellow police tape and police cars before dropping Mr. Wilson off at Wilcox Street and Kostner Avenue. Mr. Wilson noticed that Mr. Young had a dark-colored revolver with a long barrel.

¶ 53                                  D. The State's Forensic Evidence

¶ 54   Diana Pratt, a forensic scientist employed at the Illinois State Police Forensic Science Center in Chicago, was found by the court, without objection, to be an expert in firearms identification. Ms. Pratt identified the firearm retrieved by Officer Carter as one she was familiar with and had examined. She described the gun as a nine-chamber "High Standard Model R-107 Sentinel Deluxe .22-caliber revolver." Ms. Pratt explained that with most revolvers, cartridge cases are not ejected and must be manually removed before the gun is reloaded.

¶ 55   As part of her analysis, Ms. Pratt fired several test shots from the weapon and compared these to the two fired bullets and two useable fired bullet fragments collected from Mr. Abdulai's body. Ms. Pratt could only determine caliber and rifling characteristics for three of the four items she analyzed. These were all fired, she determined, from a .22-caliber weapon with six lands and grooves and a right-hand twist, the same as the test shots fired from the retrieved weapon. She was not, however, able to determine if the bullets and bullet fragments she analyzed had been fired

from that weapon. Ms. Pratt acknowledged on cross-examination that a right-hand twist "is very common," but could not say what percentage of firearms have six lands and grooves.

¶ 56    Brigid Cronin, now retired, testified that in 2012 she was an evidence technician with the Chicago Police Department and on January 12, 2012, was called to Ms. Perkins's apartment to photograph and inventory some clothing for a homicide investigation. When Officer Cronin arrived, she was directed to a pair of "denim jean pants" and a pair of white gym shoes. She identified the evidence bags used to collect these items and her handwriting where she had placed unique inventory numbers on the evidence tags. Aside from some markings and missing material where samples had been taken for testing, the items were in substantially the same condition as when she recovered them. Officer Cronin used gloves to place the items in the collection bags. She took them immediately back to her office where she sealed them and submitted them for analysis.

¶ 57    On cross-examination, Ms. Cronin could not recall if Sergeant Holy was at Ms. Perkins's apartment when she arrived there. She spoke to Detective Fiedler. She acknowledged that, as shown in her photographs, the folded jeans and the gym shoes were on the kitchen floor of the apartment, in front of the oven. When asked if another officer had placed the items there before she arrived, Ms. Cronin stated, "[n]o officer that I worked with would have done that. That's not protocol. We are the ones—the evidence technician is the one who collects the evidence."

¶ 58    Before the jury heard testimony from the State's gunshot residue expert, Ellen Chapman, defense counsel objected, arguing the State had not laid a proper foundation for her testimony. The following exchange took place:

> "[DEFENSE COUNSEL]: Your Honor, at this time we are objecting to foundation for Ms. Chapman's testimony. We believe that Ms. Chapman will testify to the gunshot residue results on the item of evidence ending in 410. Your Honor, we have testimony

regarding the recovery of that evidence. We have testimony regarding it being inventoried. What we don't have is how it came into the possession of the ISP witness, Ms. Chapman. Without that chain of custody, we believe they can't admit the testing results from those jeans.

THE COURT: What's the item that was tested?

[ASA]: The jeans and the shoes. And ET Cronin said she recovered it, inventoried it. And then this witness is going to testify that she found it in a sealed condition, that she opened it, and she tested it.

[ANOTHER ASA]: The courier that took it from Homan Square to ISP, that is not required.

THE COURT: That's not required. So your objection is overruled."

[DEFENSE COUNSEL]: Yes, Your Honor. Thank you."

¶ 59 Ms. Chapman, a forensic scientist employed at the Illinois State Police Forensic Science Center in Chicago, was found by the court, without objection, to be qualified as an expert in trace evidence and gunshot residue (GSR). Ms. Chapman explained that GSR consists of various particles released as a result of the explosion that occurs when a gun is fired. According to Ms. Chapman, GSR "comes out of the firearm, in the muzzle, first and foremost," but also from "gaps in the back and sides of the firearm" and "will deposit onto the firearm itself, and potentially onto an area surrounding the firearm, the person who's holding it, or an immediate area." Ms. Chapman looks for heavy metals—lead, barium, and antimony—alone or in combination, and must find "at least three GSR tri-component particles on a sample," plus other consistent particles, to say that an item has tested "positive" for GSR. A positive result tells her nothing about the type of ammunition or weapon that was used, only that a gun was fired in the vicinity of the item sampled

or that GSR particles were transferred from another location to that item.

¶ 60    In this case, rather than receiving a sample collected with a GSR kit, Ms. Chapman received a sealed bag containing a pair of jeans and a pair of gym shoes and administered the kit herself. To avoid contamination, she "had to garb up," wearing a mask, gloves, and a disposable lab coat. Using an electron microscope, Ms. Chapman was able to identify four tri-component GSR particles plus other consistent particles—a positive result. She also tested the front left thigh of the jeans, but that area tested negative for GSR. Ms. Chapman's conclusion was "that the interior front waistband area of those jeans either contacted a gunshot residue-related item or was in the environment of [a] discharged firearm."

¶ 61    On cross-examination, Ms. Chapman acknowledged that she conducted her testing in October 2012, ten months after the jeans were inventoried and collected. This was not a problem, she explained, because "[GSR] particles are stable" and "persist for a long period of time." Such particles linger much longer on clothing than they do on a person's hands. Ms. Chapman agreed that "because gunshot residue lasts for so long, it can't tell you when [a] gun was fired." Ms. Chapman agreed that GSR can be transferred from one object to another through direct contact (primary transfer), and that secondary or even tertiary transfers are possible.

¶ 62    The State rested. The trial court denied Mr. Young's motion for a directed verdict as to the armed robbery charge, and the defense rested without presenting additional evidence. The portion of the State's closing argument that is at issue in this appeal is discussed at some length below.

¶ 63    The jury found Mr. Young guilty of first degree murder and armed robbery. The jury additionally found that during the course of these offenses, Mr. Young personally discharged a firearm that proximately caused Mr. Abdulai's death. The trial court sentenced Mr. Young to an aggregate term of 96 years in prison.

¶ 64                                    II. JURISDICTION

¶ 65    The trial court denied Mr. Young's motion to reconsider his sentence on August 8, 2018, and Mr. Young timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 66                                    III. ANALYSIS

¶ 67    On appeal, Mr. Young argues that the trial court erred by (1) allowing the State to elicit and reference in its closing arguments testimony conveying the substance of an anonymous call made to the police that the court had allowed into evidence for the limited purpose of explaining the course of the officers' investigation, (2) allowing in the GSR evidence from the jeans Mr. Young purportedly wore during the shooting because the State failed to take reasonable measures to ensure that the jeans had not been contaminated, (3) failing to properly admonish potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and (4) allowing inadmissible prior statements purportedly made by Mr. Giles to be presented to the jury as either substantive evidence or for impeachment. We consider each issue in turn.

¶ 68                                A. The Anonymous Caller

¶ 69    We first consider Mr. Young's argument that the trial court erred by allowing the State to elicit hearsay testimony conveying the substance of an anonymous call made to the police. Hearsay—any out-of-court statement offered for the truth of the matter asserted—is generally inadmissible at trial. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); Ill. R. Evid. 802 (eff. Jan. 1, 2011). This is so because the opposing party lacks the ability to test the credibility of an out-of-court declarant through cross-examination. *People v. Yancy*, 368 Ill. App. 3d 381, 385 (2005). An

exception to this rule permits a police officer to refer to a communication the officer received for the limited purpose of explaining the investigative steps taken by the officer. *People v. Trotter*, 254 Ill. App. 3d 514, 527 (1993). "If such testimony is presented, however, the trial court must instruct the jury that the testimony was introduced for the limited purpose of explaining what caused the police to act, and that they [are] not to accept the statement as true." *Id.*

¶ 70      When Mr. Young filed a motion *in limine* to prevent the State from submitting hearsay testimony regarding the anonymous call received by the police in this case, the trial court granted the motion in part, stating that "[t]he contents of the call will not be allowed in. The fact that [the police] get a call and go do something in response to a call, is allowed." When asked, however, how he became involved in the investigation of Mr. Abdulai's murder, Sergeant Holy stated, "I became aware of an anonymous phone call that was received by Sergeant Gilbert I believe on the 7th of January naming the offender in this homicide." Defense counsel immediately objected and moved to strike this response and her objection was correctly sustained. The trial court instructed the jury to disregard Sergeant Holy's response. The State then asked what Sergeant Holy did first in connection with his investigation, and, with no further objection from defense counsel, the sergeant stated that he began searching police databases "in regards to that phone call that was received" for a silver Buick Century registered to Ms. Perkins.

¶ 71      Mr. Young argues that even though the trial court sustained his counsel's objection and struck Sergeant Holy's initial response, the sergeant's subsequent response left no doubt that the anonymous caller had identified Mr. Young as the person who shot Mr. Abdulai. But this is a fair reading of the testimony only if one presumes that the jurors did not heed the trial court's instruction to disregard Sergeant Holy's initial statement. Sergeant Holy's subsequent response, that an anonymous call led him to begin searching for a particular vehicle, properly fell within the

course of investigation exception to the rule against hearsay. In its instructions to the jury before deliberations, the trial court reminded the jurors that they "should disregard questions and exhibits which were withdrawn or to which objections were sustained" and "should disregard testimony and exhibits which the court ha[d] refused or stricken." "[A] strong presumption exists that the jury follows a limiting instruction" (*People v. Williams*, 384 Ill. App. 3d 327, 334 (2008)), and Mr. Young has offered nothing to rebut that presumption here.

¶ 72    Mr. Young goes on to argue that the State made inappropriate comments about the credibility of the anonymous caller in its closing argument, improperly implying to the jury that the caller's statements to the police could be considered as substantive evidence. The argument that the State made is set out in some detail below. Mr. Young acknowledges that he did not preserve this argument for appeal but argues that we should review it as plain error.

¶ 73    As our supreme court has explained: "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Under either the first or second prong of this doctrine, our initial task is to identify a clear or obvious error in the defendant's trial. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 74    A "defendant faces a substantial burden in attempting to achieve reversal based upon improper remarks made during closing argument." *People v. Byron*, 164 Ill. 2d 279, 295 (1995). The State generally has "wide latitude" in the content of its closing arguments (*People v. Perry*, 224 Ill. 2d 312, 347 (2007)) and may comment on the evidence and any fair and reasonable inferences to be drawn, even when those "inferences reflect negatively on the defendant" (*People v. Nicholas*, 218 Ill. 2d 104, 121 (2005)). We must "consider the closing argument as a whole,

rather than focusing on selected phrases or remarks" (*Perry*, 224 Ill. 2d at 347) and will generally only find reversible error "if a defendant can identify remarks of the prosecutor that were both improper and so prejudicial that real justice [was] denied or that the verdict of the jury may have resulted from the error" (internal quotation marks omitted) (*People v. Evans*, 209 Ill. 2d 194, 225 (2004)). There is a split of authority on the proper standard of review in such cases. Compare *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) ("Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*."), with *People v. Macri*, 185 Ill. 2d 1, 51 (1998) ("The trial court is in the best position to determine the prejudicial effect of a remark made during closing argument, and, therefore, absent a clear abuse of discretion, its ruling should be upheld."). Because we conclude that a clear and obvious error was made here under either standard, we need not resolve this conflict.

¶ 75    The State acknowledged in its closing argument in this case that several of its witnesses had recanted at trial when they were faced with telling their stories publicly and in front of Mr. Young. The State urged the jurors to find that the accounts those witnesses had previously given to the police and grand jury were more credible than their denials at trial. The State noted that even though a number of people witnessed Mr. Young rob and shoot Mr. Abdulai or were present when he went on a "bragging tour of the west side," the overwhelming majority of those witnesses had not voluntarily come forward to tell the police what they knew. He asked the jurors to consider why this might be, stating:

> "Now why is it that people won't talk to the police? Tiesha Crayton didn't talk to the police. Laura Perkins certainly didn't talk to the police. She got pulled over by a police officer and written a ticket. She certainly at that moment could have said he just killed somebody, and she didn't. And I would submit to you, ladies and gentlemen, that we live

in a place and time right now where people do not want to be seen talking to the police.

* * *

They do not want to be known as snitches or someone who will talk to the police. But what happened the next day? Kim, shrouded in the clothes of anonymity, calls the police station. She doesn't call 911. She calls the detective division, and she gives them a lead. And that is what puts the police on the road to finding out who killed Olufemi Abdulai."

¶ 76    We agree with Mr. Young that these statements improperly encouraged the jury to believe that "Kim," the anonymous caller, was more credible than other witnesses because she was protected by her anonymity. The only reason the jurors would have needed to consider Kim's credibility, however, was if they were going to treat what she told to the police as substantive evidence, something they were clearly not permitted to do under the rules of evidence. We find that this was clear error. *Cf. People v. Sample*, 326 Ill. App. 3d 914, 924 (2001) (finding clear error where questioning of an officer elicited hearsay responses that went beyond "simple police procedure" and where the State had anticipated and commented on that testimony in its opening statement).

¶ 77    This was improper and it should not have happened. However, we disagree with Mr. Young's assertion that it requires us to reverse his conviction. First, it is clear to us that the evidence in this case was not closely balanced and that there is thus no first-prong plain error.

¶ 78    Whether evidence is closely balanced requires a "qualitative, commonsense assessment" of the evidence on both the substantive elements of the charged offense and the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53. "The issue *** does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *Id.* ¶ 60. The evidence may be closely

balanced if each party provides a credible version of events and no evidence corroborates either account. *Id.* ¶ 63.

¶ 79    The jury in this case heard Ms. Perkins, who was with Mr. Young throughout the day, describe his proximity to the crime scene and his actions just before and after the shooting, and who later heard him admit to being the shooter. Ms. Perkins's account was corroborated by the testimony of numerous other witnesses in addition to the prior statements of the recanting witnesses, including Mr. Dell's account of witnessing the shooting. Mr. Young acknowledges that Ms. Perkins was the State's "star witness." His speculation that "[t]he jurors might have thought she had an incentive to testify favorably for the State in order to earn her release from custody," does not, in our view, sufficiently detract from the probable impact of her comprehensive and damaging testimony. The jury also heard from Ms. Crayton, who witnessed the shooting firsthand and recounted how Mr. Young confessed to her shortly thereafter. Ms. Crayton's credibility may have been affected by the fact that she was initially a suspect in this case, but the jury also heard the intercepted telephone conversation between her and Mr. Young that took place just days after the shooting, in which the two openly debated who had seen what Mr. Young did.

¶ 80    The inconsistencies in some of the testimony—for instance, as to when Mr. Young put on a ski mask and when he changed his clothes—were the exceptions, not the rule. The State's case hung together quite well throughout trial, with the witnesses largely corroborating each other's accounts. This was no small feat in such a sprawling case.

¶ 81    The testimony was also consistent with the physical evidence. Although the firearms expert could not say that the bullets recovered from the victim's body were fired from the revolver recovered from Mr. Young after the shooting, it could not be ruled out that they had. There was GSR found on Mr. Young's clothing, notwithstanding an effective cross-examination that

introduced the possibility that the GSR had been transferred as a result of improper handling by a police officer. It is also true that no one at trial could say what happened to the gray hoodie or the spent shell casings. The physical evidence that was available in this case, while not the primary building blocks for the State's case, corroborated the witnesses' detailed and compelling testimony. Under these circumstances, we cannot say the evidence was closely balanced.

¶ 82     We are also not persuaded that this closing argument constituted second-prong plain error. Mr. Young points to this court's opinion in *Sample* as support. In that case there was an extraordinarily "disturbing" colloquy between the State and a testifying officer, in which the State "repeatedly elicited testimony that contained a strong inference that [the co-defendants in that case] had implicated [the] defendant in their statements." *Sample*, 326 Ill. App. 3d at 922. The State did not question the officer merely to establish a course of conduct, but "asked serial questions" clearly intended "to build the inference that [the] defendant had been named by his criminal cohorts." *Id.* The State then used the testimony substantively to try to establish that the defendant was a person nicknamed "Little Rib." *Id.* The extreme circumstances present in *Sample* led us to conclude that there was second-prong error because the defendant's fundamental right to confront witnesses against him had been violated. *Id.* This case, in which there was a brief reference in a closing argument that suggested hearsay should be considered as substantive evidence, is fundamentally different from *Sample*.

¶ 83     In sum, although the State's implication in its closing argument that hearsay statements made by an anonymous caller could be considered substantively was a clear and obvious error, that error did not rise to the level of plain error under either prong of the plain-error doctrine.

¶ 84                    B. Gunshot Residue Found on the Pair of Jeans

¶ 85     Mr. Young argues that because no witness could sufficiently explain how the jeans Ms.

Perkins identified as the ones Mr. Young wore on the day of the shooting were moved from the bedroom laundry hamper to the floor of her apartment, the State failed to present a sufficient chain of custody for the jeans to be admitted into evidence. Ms. Perkins testified that one of the officers moved the jeans, but she did not know who that individual was. Both Detective Holy and Ms. Cronin stated they did not move the jeans and did not know who did. And Ms. Cronin testified that it would have been against protocol for anyone but an evidence technician to handle evidence intended for testing.

¶ 86    Although the parties frame this solely as a chain of custody issue, and the State argues that Mr. Young's objection was not properly preserved, there are actually two issues and we will assume for purposes of our analysis that Mr. Young made the proper objections in order to preserve both of them.

¶ 87    It is well settled that "[t]he character of the object sought to be introduced into evidence determines the appropriate method of establishing a foundation." *People v. Coger*, 2019 IL App (1st) 163250, ¶ 20. Because compounds suspected of containing controlled substances generally are not readily distinguishable from one another, the State "has the burden of establishing a chain of custody as the foundation for the admission of such evidence." *Id.* "When an item has readily identifiable and unique characteristics and its composition is not easily changed," however, "the State may lay an adequate foundation through testimony that the item sought to be admitted is the same as the item recovered and is in substantially the same condition as when it was recovered." *Id.* Whether a sufficient foundation was laid is a matter within the trial court's discretion. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 109.

¶ 88    Here, Ms. Perkins identified the jeans the State tested as the same ones that Mr. Young wore on the day of the shooting and which she showed Detective Holy in her laundry hamper. She

further testified that at the time of trial they were in the same or substantially the same condition as when she had last seen them. Detective Holy's testimony that the jeans Ms. Perkins showed him were "blue denim Rocawear jeans" supports the conclusion that the jeans possessed identifiable characteristics. This was a sufficient foundation for the jeans to be admitted into evidence.

¶ 89    The other issue is whether the testimony about the GSR was proper. The State offered that testimony to demonstrate that Mr. Young himself had been carrying a recently fired gun. The GSR testimony is admissible because there was testimonial evidence that these jeans were worn by Mr. Young. The possibility of contamination goes to the weight, not to the admissibility of that testimony.

¶ 90    In *People v. Morris*, 2013 IL App (1st) 111251, ¶¶ 63, 87, the State's witnesses identified various articles of clothing as ones the defendant in that case had worn on the morning in question and forensic testing revealed that blood on that clothing belonged to the victim. On appeal, the defendant argued the clothing had been improperly admitted because blood is a "highly fungible, highly transferrable substance" and the State should have been required to establish a chain of custody. *Id.* ¶ 89. We rejected this argument, concluding that the clothing was "readily identifiable by unique characteristics that were not easily subject to change." *Id.* ¶¶ 87, 92.

¶ 91    Also persuasive, and even more directly on point, is the Seventh Circuit Court of Appeals' decision in *United States v. Lee*, 502 F. 3d 691 (7th Cir. 2007). When the defendant in *Lee* was arrested, his jacket was placed in a cloth property bag. *Id.* at 697. Testimony at trial established that such bags were reused from inmate to inmate without being laundered or sterilized between uses. *Id.* At some point the jacket was removed from the cloth bag and placed in a plastic evidence bag for testing, which revealed the presence of GSR. *Id.* The Seventh Circuit concluded that the trial court did not err in admitting the jacket or the expert testimony concerning the GSR. *Id.* at

698. In the court's view, "potential contamination of [the] jacket [went] to the weight of the evidence, not its admissibility." *Id.* The defendant was free to argue, and did argue, that the jury should place little weight on the gunshot residue testimony because of the possibility of contamination. *Id.*

¶ 92    The same is true here. Mr. Young's trial counsel effectively cross-examined Ms. Chapman on the possibility of GSR contamination, eliciting testimony from her that "gunshot residue particles are stable," that they "persist for a long period of time," that they can linger much longer on clothing than they do on a person's hands, and that it is possible for them to be transferred from one object to another through direct contact. Defense counsel emphasized this testimony in his closing argument, telling the jurors this information "should give [them] pause" and comparing the transfer of GSR particles from object to object to the spread of germs from person to person. Mr. Young also pointed out in his posttrial motion that "it [was] possible that trace evidence of gunshot residue [was] transferred to the jeans when they were removed from the hamper and were placed folded on the kitchen floor in front of the stove." He unsuccessfully argued that "reasonable doubt exist[ed] due to the dubious manner [in which his] clothes were recovered."

¶ 93    The trial court did not abuse its discretion by allowing either the jeans or the GSR testimony to be admitted at trial.

¶ 94                    C. The Trial Court's Admonitions to the Venire

¶ 95    Mr. Young additionally argues that he is entitled to a new trial because the trial court failed to properly admonish the venire in accordance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). That rule requires the trial court to:

"ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the

charge(s) against him or her; (2) that before a defendant can be convicted the State Must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

We review a trial court's compliance with this rule *de novo*. *People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 96    Our supreme court has made clear that compliance with Rule 431(b) "requires questioning on whether the potential jurors both understand *and* accept each of the enumerated principles." (Emphasis added.) *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The trial court in this case asked the members of the venire whether they accepted and agreed with the principles, but not whether they understood them. The State concedes that this was error. See *Belknap*, 2014 IL 117094, ¶ 46 (finding error where the court asked potential jurors if they "had any disagreement or quarrel with" the four principles, but not whether they understood them).

¶ 97    Having made no objection to the admonitions in the trial court, however, Mr. Young may raise the issue on appeal only as a matter of plain error. *Sebby*, 2017 IL 119445, ¶ 48. Except where there is evidence that a violation of Rule 431(b) actually resulted in a biased jury, a trial court's failure to comply with the rule is not a second-prong structural error requiring automatic reversal. *Id.* ¶ 52. Instead, a defendant seeking to challenge such a violation as plain error must demonstrate that the evidence at trial was closely balanced. *Id.* ¶ 51. Mr. Young makes no argument that the trial court's inadequate admonishments resulted in a jury that was actually biased against him. His argument fails because, as discussed above, the evidence in this case was not closely balanced.

¶ 98                    D. Mr. Giles's Prior Inconsistent Statement

¶ 99    Finally, Mr. Young argues the trial court erred when it allowed ASA Lanahan to testify

regarding the contents of a handwritten statement she purportedly took from Mr. Giles on January 18, 2012. According to that statement, Mr. Giles was riding in a car with Mr. Young on January 6, 2012, when Mr. Young said, "I think I shot someone, I think I killed him, I shot [the] dude" and, later, "I shot the guy on Monroe." Mr. Young argues that no exception to the rule against hearsay made these statements admissible at trial. We agree.

¶ 100   An exception to the rule against hearsay, codified at section 115-10.1 of the Code of Criminal Procedure (Code), provides that the prior inconsistent statement of a testifying witness who is subject to cross-examination concerning that statement may be admitted as substantive evidence where the statement "was made under oath at a trial, hearing, or other proceeding." 725 ILCS 5/115-10.1(a), (b), (c)(1) (West 2016). A prior inconsistent statement may also be admitted substantively if it "narrates, describes, or explains an event or condition of which the witness had personal knowledge" and (1) "the statement is proved to have been written or signed by the witness," (2) the witness acknowledges under oath that he or she made the statement, or (3) an accurate video or sound recording of the statement was made. *Id.* at 115-10.1(a), (b), (c)(2) (West 2016).

¶ 101   Here, the prior inconsistent statements attributed to Mr. Giles were not made under oath by him at a court proceeding. Nor, to the extent that they repeated second-hand statements, did they concern a matter he had personal knowledge of. To satisfy the "personal knowledge" requirement of section 115-10.1, "the witness whose prior inconsistent statement is being offered into evidence must actually have perceived the events which are the subject of that statement." (Internal quotation marks omitted.) *People v. Cooper*, 188 Ill. App. 3d 971, 973 (1989). "Excluded *** are statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements." *People v. Morgason*, 311 Ill. App. 3d 1005, 1011

(2000); see also *People v. McCarter*, 385 Ill. App. 3d 919, 931 (2008) ("prior inconsistent statements which consist of secondhand accounts of events are still inadmissible hearsay, notwithstanding section 115-10.1"). The rationale behind this requirement is straightforward: "if the witness is merely narrating a third-party statement about which [he or she] has no personal knowledge, cross-examination gives the jury no insight into the truth of that statement, making it more difficult to judge its reliability." *Id.* at 931. Statements attributed to Mr. Giles that merely repeated out-of-court statements made to him by Mr. Young do not satisfy the personal knowledge requirement of section 115-10.1(c)(2). Thus, while the testimony that he saw Mr. Young with a gun was admissible, Mr. Giles's statements as to Mr. Young's admissions were not.

¶ 102   A prior inconsistent statement that fails to meet the criteria set out in section 115-10.1 may still be used to impeach a witness on non-collateral matters. 725 ILCS 5/115-10.1 (West 2016). But a party may impeach its own witness in this manner only where that witness's testimony has done "affirmative damage" to the party's case. Ill. R. Evid. 607 (eff. Jan. 1, 2011). For the State to impeach its own witness with a prior inconsistent statement, "[i]t is insufficient that [the] witness merely disappoint[ed] the State by failing to incriminate the defendant." *McCarter*, 385 Ill. App. 3d at 933. Instead, the witness's testimony must have been inconsistent with the defendant's guilt or have otherwise given "positive aid" to the defendant's case. *People v. Cruz*, 162 Ill. 2d 314, 362 (1994). At trial, Mr. Giles testified that he did not remember getting into a car with Mr. Young on January 6, 2012, or indeed anything else that happened that day. This testimony, which neither incriminated nor exculpated Mr. Young, did not affirmatively damage the State's case.

¶ 103   We will disturb a trial court's evidentiary rulings only where the court abused its discretion. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). The record in this case is clear, however, that the prior inconsistent statements attributed to Mr. Giles were inadmissible, either as substantive

evidence or for impeachment.

¶ 104   The State agrees with all of this but argues that Mr. Young failed to fully preserve the issue of Mr. Giles's personal knowledge for our review. He raised it in a motion *in limine* but in his posttrial motion only argued that Mr. Giles should not have been impeached with his prior statements. We are disinclined to find forfeiture under these circumstances. Although it is true that "[a] posttrial motion must alert the trial court to an alleged error with enough specificity to give the court [a] reasonable opportunity to correct it" (*People v. McCoy*, 2016 IL App (1st) 130988, ¶ 56), in our view an argument that evidence is inadmissible for the limited purpose of impeaching a witness necessarily includes the argument that the evidence is inadmissible more broadly, as substantive evidence. A party forfeits issues, not arguments (*Brunton v. Kruger*, 2015 IL 117663, ¶ 76), and the issue Mr. Young preserved was whether it was an abuse of discretion to allow these prior inconsistent statements to be introduced at trial.

¶ 105   The State also maintains that any error regarding the admissibility of the prior inconsistent statements attributed to Mr. Giles was harmless. "An error is harmless where there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." (Internal quotation marks omitted and emphasis in original.) *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 55.

¶ 106   This court has repeatedly held that "the erroneous admission of a prior inconsistent statement is harmless where it is cumulative to properly admitted evidence." *People v. Wesley*, 2019 IL App (1st) 170442, ¶ 28; see also, *e.g.*, *People v. Cook*, 2018 IL App (1st) 142134, ¶ 49; *People v. French*, 2017 IL App (1st) 141815, ¶ 44; *Wilson*, 2012 IL App (1st) 101038, ¶¶ 56-68; *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 38; *People v. Harvey*, 366 Ill. App. 3d 910, 921-22 (2006). Here, Mr. Giles's sworn grand jury testimony was properly admitted as substantive evidence pursuant to section 115-10.1(c)(1) (725 ILCS 5/115-10.1(c)(1) (West 2016)). ASA

Graunke testified that Mr. Giles told the grand jury that when he was in the car with Mr. Young, Mr. Young "said that he thought he himself had shot and killed somebody." The challenged portions of the handwritten statement ASA Lanahan stated she took from Mr. Giles are substantially similar to this testimony and thus cumulative to properly admitted evidence.

¶ 107   Mr. Young cites *People v. Hobson*, 2014 IL App (1st) 110585, for the proposition that a defendant may still be prejudiced by the improper admission of cumulative evidence where it serves to unfairly bolster the credibility of admissible evidence. The defendant in *Hobson* was found guilty of murder following a bench trial in which several of the State's witnesses recanted, claiming they had been coerced by the police to sign false statements and give false testimony to the grand jury. *Id.* ¶¶ 5-13. The trial judge in that case expressly relied on prior inconsistent statements those witnesses had made to the police as substantive evidence supporting its finding of guilt. *Id.* ¶ 13. The defendant's postconviction petition, in which he argued that his trial counsel was ineffective for failing to object to the admission of the prior inconsistent statements, was dismissed at the second stage, and this court reversed. *Id.* ¶¶ 14-16. We found that there was no strategic reason for counsel's failure to object to inadmissible statements that "bolstered [the witnesses'] grand jury testimony and made their testimony in court more subject to doubt."

¶ 108   However, this was far from the only reason why we concluded that the defendant in *Hobson* had made a substantial showing that he probably would have achieved a better result at trial absent his counsel's unprofessional errors. *Id.* ¶ 29. Trial counsel in that case had also failed to investigate and present evidence that the witnesses were coerced into giving their grand jury testimony through promises of extreme leniency on charges that they faced and had failed to impeach an officer who incorrectly testified that one of the witnesses had no warrant out for his arrest at the time he was questioned. These *combined* errors resulted in such a lack of support for the recanting

witnesses' testimony at trial that we concluded that even cumulative testimony may have impacted the outcome. *Id.* ¶ 29. Mr. Young makes no similar case for rebutting the presumption that the cumulative nature of improperly admitted evidence generally negates its harm.

¶ 109   In *Hobson* we also noted that, aside from circumstantial evidence and the testimony of the officer who should have been impeached, the State had only the prior inconsistent statements and grand jury testimony of the recanting witnesses to rely on. *Id.* ¶ 29. Here, by contrast, Mr. Giles's grand jury testimony conveying Mr. Young's confession was corroborated by the ample evidence that we have described above. Under these circumstances, any bolstering achieved through the admission of Mr. Giles's prior statement was harmless and was not grounds for a finding of reversible error.

¶ 110                                IV. CONCLUSION

¶ 111   For the above reasons, we affirm the judgment of the circuit court.

¶ 112   Affirmed.